ET & WNC TRANSPORTATION COMPANY, A CORPORATION, V. JAMES S. CURRIE, COMMISSIONER OF REVENUE OF THE STATE OF NORTH CAROLINA.

(Filed 30 June, 1958.)

**1. Taxation § 38c—**

The proper procedure for a taxpayer to determine liability for a tax is to pay the tax under protest and sue to recover such payment. G.S. 105-267.

**2. Taxation §§ 28, 29—**

There is a clear distinction made by statute between an excise tax imposed on domestic and foreign corporations for the privilege of transacting business within the State, and an income tax on net corporate income based on a past fact of earned net profits. G.S. Chapter 105, Art. 4.

**3. Constitutional Law § 27:    Taxation § 29—Income tax on corporation engaged in interstate transportation is not direct burden on commerce.**

An income tax imposed under G.S. 105-134, G.S. 105-136, on a foreign corporation engaged exclusively in interstate commerce does not impose a burden on interstate commerce in contravention of Art. I, sec. 8, of the Constitution of the United States, since no tax is imposed if such corporation should have no net income earned within North Carolina by reason of its interstate business, and the tax is imposed only upon that portion of its net income which is reasonably attributable to its interstate business done or performed within the borders of the State, without any discrimination against the taxpayer either in the admeasurement of the tax or the means for enforcing it, and the tax not being upon the franchise to engage in interstate business within the State.

**4. Constitutional Law § 24—**

The term "law of the land" as used in Art. I, sec. 17, of the State Constitution, is synonymous with "due process of law" as used in the Federal Constitution.

**5. Same:    Taxation § 29—**

The imposition of an income tax under G.S. 105-134 and G.S. 105-136 upon a foreign corporation engaged exclusively in interstate commerce in regard to its operations within the State, which corporation rents a number of terminals and maintains a number of delivery trucks at such terminals in this State, and employs a number of residents in the State and engages in systematic and continuous business herein, is not in violation of due process of law, Art. I, sec. 17, of the State Constitution, Fourteenth Amendment to the Federal Constitution, there being no discrimination in the imposition of the tax.

RODMAN, J., took no part in the consideration or decision of this case.

APPEAL by plaintiff from *Hall, J.,* October 1957 Regular Civil Term of WAKE.

Civil action against the Commissioner of Revenue of the State of North Carolina to recover taxes paid under protest.

The action was heard upon an agreed stipulation of facts, the parties by their attorneys having in writing waived a jury trial. A summary of the agreed stipulation of facts follows:

One. Plaintiff, a Delaware corporation, with its principal office in Johnson City, Tennessee, is a common carrier of freight for compensation by motor vehicles in interstate commerce only between the States of North Carolina, South Carolina, Virginia, Georgia and Tennessee, except that in the State of Tennessee it also engages in intrastate business. All of its interstate business is authorized, permitted, supervised and directed under the jurisdiction of the Interstate Commerce Commission in accordance with the Federal Motor Carrier Act of the Congress of 1935, and amendments thereto (U. S. C. A., Title 49, Sec. 301 *et seq.*), and the Commerce Clause of the Federal Constitution (U. S. Const., Art. I, sec. 8, (3) ). Its intrastate business in Tennessee is under the jurisdiction of the Tennessee Public Service Commission. It has no offices in North Carolina, except such as are incident to its motor freight terminals, which are necessary for its interstate operations in this State. It has never been domesticated in North Carolina. It has never been authorized by North Carolina to do intrastate business. All of its business in North Carolina is now, and always has been, exclusively interstate in character.

Two. The purpose of the action is to recover from the defendant income taxes in the sum of $15,812.80 paid to the State of North Carolina under protest by plaintiff.

Three. The income taxes, which the defendant required the plaintiff to pay, were levied pursuant to the provisions of G.S. Ch. 105, Art. 4, and in particular Sections 105-134 and 105-136 of said chapter and article.

Four. Plaintiff owns no real estate in North Carolina, but rents and maintains freight terminals in various places in the State solely for its interstate operations. These terminals are manned by employees of plaintiff, who usually live in the State, and whose duties pertain only to its interstate activities. Plaintiff hauls into North Carolina interstate freight only by its interstate motor vehicles. Plaintiff owns no personal property in North Carolina, except pickup and delivery trucks, together with furniture, fixtures and equipment necessary for its terminals. These pickup and delivery trucks are licensed in North Carolina. When freight is received at its various terminals in the State, it is delivered to the consignees, either direct from the interstate motor vehicles, or in delivery trucks stationed at the respective terminals. Its delivery trucks pick up interstate freight from its customers destined for or consigned to points or parties outside of North Carolina, and take it to its terminals. There such freight is billed and loaded into its interstate trucks, and transported to destinations out-

side of North Carolina. Usually when a full truckload of freight is shipped to or from any customer in North Carolina, its interstate trucks go to the customer's place of business. Sometimes such truckloads go by the terminals when it is too late to deliver the freight at night, or to get started, or when a Sunday or a holiday intervenes. In the case of less than truckload shipments, its pickup trucks gather freight from its customers for assembly into full truckloads at its various terminals in the State. These pickup trucks act as a part of its interstate shipments of freight. Plaintiff does not handle any purely intrastate shipments of freight in North Carolina. The only freight plaintiff handles is that which either originates outside of North Carolina, or is destined outside of the State.

Five. During its fiscal year from 1 July 1954 to 30 June 1955, plaintiff paid rentals on its terminals in North Carolina in the amount of $21,911.00. During its same fiscal year, it paid in North Carolina the following taxes:

| | |
|---|---:|
| Gasoline Taxes | $38,868.00 |
| Truck License Taxes | $ 6,294.00 |
| Personal Property Taxes | $ 394.00 |
| N. C. Unemployment Taxes | $ 3,338.00 |
| Intangible Property Taxes | $ 60.00 |
| Total Taxes Paid in North Carolina | $48,954.00 |

During the same fiscal year, plaintiff paid substantial rentals and taxes in other States in which it operated, except in the State of Virginia. During its fiscal years ending 30 June 1955 and 30 June 1956, the interstate motor vehicles which plaintiff operated were largely based and taxed in Tennessee, and used Tennessee license plates in its operations under reciprocal agreements between Tennessee and the other States in which it operated, by which the interstate motor vehicles are to be taxed and licensed in the carrier's domicile or principal place of business. Under the reciprocal agreement between North Carolina and Tennessee, plaintiff, for its fiscal year ending 30 June 1955, paid license plate taxes to Tennessee for its interstate motor vehicles in the sum of $71,886.38. During its fiscal year from 1 July 1955 to 30 June 1956, plaintiff paid the same rentals on its terminals in North Carolina, and substantially the same amount of taxes in North Carolina, as it did during its preceding fiscal year, and also paid substantial rentals and taxes in other States in which it operated, except Virginia, and license plate taxes to Tennessee on its interstate trucks in the amount of $78,589.00.

Six. On 31 August 1954 defendant requested in writing that plaintiff furnish him certain information, and explain why it had not filed state income tax returns. On 9 September 1954 plaintiff furnished in writing the information requested, and stated it was not subject to income tax to North Carolina. On 7 October 1954 defendant wrote plaintiff that as Commissioner of Revenue of the State of North Carolina he proposed to assess and levy a tax upon its income pursuant to G.S., Ch. 105, and demanded that it furnish him from its books and records information whereby the amount of such tax might be determined.

Seven. On 3 January 1955, at plaintiff's request, a hearing was held in defendant's office, at which plaintiff presented evidence, and contended it was not subject to the payment of income tax to North Carolina. On 17 June 1955 defendant rendered a decision directing plaintiff to file state income tax returns.

Eight. On 28 June 1955 plaintiff filed state income tax returns for the years ending 30 June 1950 through 30 June 1954.

Nine. On 29 June 1955 defendant made an assessment against the plaintiff for state income tax as follows:

Year ending 30 June 1950.....  ....................$ 4,265.23
Year ending 30 June 1951 ..........  .............$ 3,706.09
Year ending 30 June 1952 . ..... ....  .............$ 1,735.20
Year ending 30 June 1953...........................$ 3,872.89
Year ending 30 June 1954....... ................. ..$   890.44

Defendant by letter notified plaintiff of this assessment.

Ten. On 5 July 1955 plaintiff paid under protest to defendant the taxes set forth in paragraph nine.

Eleven. On 25 July 1955 plaintiff made a demand in writing upon defendant for a refund of the above taxes paid, with interest thereon, but defendant refuses to make a refund.

Twelve. On 19 July 1955 defendant made a further assessment against plaintiff for state income tax in the amount of $1,045.86 for a period of time from 1 January 1949 to 30 June 1949. Plaintiff paid defendant this tax under protest, and defendant refuses its demand to refund it.

Thirteen. On 23 September 1955 defendant made a further assessment against plaintiff for state income tax for its fiscal year ending 30 June 1955 in the amount of $295.00. Plaintiff paid defendant this tax under protest, and defendant refuses its demand to refund it.

Judge Hall, after considering the stipulations of facts and arguments of counsel, being of the opinion that the taxes assessed by the

defendant, and paid by plaintiff under protest were properly assessed and collected, rendered judgment that the plaintiff recover nothing from the defendant, and be taxed with the costs.

From the judgment plaintiff appeals.

*Harkins, Van Winkle, Walton & Buck and Cox, Epps, Powell & Weller for plaintiff, appellant.*

*George B. Patton, Attorney General, and Basil L. Sherrill, Assistant Attorney General for defendant, appellee.*

PARKER, J.   Plaintiff has adopted the proper procedure to have determined the validity of the taxes assessed against it, which it paid. G.S. 105-267; *Buchan v. Shaw, Comr. of Revenue,* 238 N.C. 522, 78 S.E. 2d 317.

According to the agreed stipulation of facts, the taxes, which are the subject of this suit, were imposed and collected under the provisions of G.S. 105-134 and G.S. 105-136, which sections appear under Chapter 105 of the General Statutes, Article 4, "Schedule D. Income Taxes," as said sections were in full force and effect prior to the amendments and supplements to The Revenue Act enacted at the 1957 Session of the General Assembly. Session Laws of North Carolina 1957, Chapter 1340.

Chapter 105 of the General Statutes is designated "Taxation." Of this Chapter, Article 1, is designated "Schedule A. Inheritance Tax"; Article 2, "Schedule B. License Taxes"; Article 3, "Schedule C. Franchise Tax"; Article 4, "Schedule D. Income Tax"; Article 5, "Schedule E. Sales Tax"; Article 6, "Schedule G. Gift Taxes"; Article 7, "Schedule H. Intangible Personal Property."

While the towns, cities and counties in North Carolina impose ad valorem taxes on real and personal property of individuals, firms and corporations, the State of North Carolina does not.

The general purpose of Chapter 105, Article 4, "Schedule D. Income Tax," is expressed in G.S. 105-131, as follows: "To impose a tax for the use of the State government upon the net income in excess of the exemption herein allowed . . . (a) of every resident of the State; (b) of every domestic corporation; (c) of every foreign corporation and of every nonresident individual having a business or agency in this State or income from property owned, and from every business, trade, profession or occupation carried on in this State."

G.S. 105-134, II. Foreign Corporations, provides: "Every foreign corporation doing business in this State shall pay annually an income

tax equivalent to six per cent of a proportion of its entire net income, to be determined according to the following rules." The rule followed by the defendant here is set forth in paragraph 3 of G.S. 105-134, and provides that "the total income of such corporation shall be apportioned to North Carolina on the basis of the ratio of its gross receipts in this State during the income year to its gross receipts for such year within and without the State," and G.S. 105-134,3, (a), further provides that "the words 'gross receipts' as used in this subsection shall be taken to mean and include the entire receipts for business done by such company."

G.S. 105-136 provides a basis for ascertaining the net income of every corporation engaged in the business of operating a steam, electric railroad, express service, telephone or telegraph business, or other form of public service, when such company is required by the Interstate Commerce Commission to keep records according to its standard classification of accounting. This statute further provides how the net revenue within this State of such a corporation from operations shall be ascertained, when the business of such a corporation is in part within and in part without the State. It also provides that from the net operating income thus ascertained shall be deducted uncollectible revenue, and taxes paid in this State for the income year other than income taxes. G.S. 105-136 further provides: "For the purposes of this section the words 'interstate business' shall mean, as to transportation companies, operating revenue earned within the State by reason of the interstate transportation of persons or property into, out of, or through this State. . . ."

The appellant makes no contention that the *amounts* of the income taxes assessed against it, which it paid, are incorrect. It contends that these income taxes were not lawfully assessed and collected from it on two grounds. One. The statutes under which these income taxes were assessed and collected from it constitute a burden on interstate commerce, and violate the Commerce Clause of the Federal Constitution. Two. The collection of such income taxes violates the due process phrase of the 14th amendment to the Federal Constitution, and also Art. I, Section 17, of the North Carolina Constitution.

Chapter 105, Article 3, is designated "Schedule C. Franchise Tax." Section 105-114 of this article explicitly states the nature of this tax: "The taxes levied in this article upon persons and partnerships are for the privilege of engaging in business or doing the act named. The taxes levied in this article upon corporations are privilege or excise taxes levied upon: . . . (2) corporations not organized under the laws of this State for doing business in this State and for the benefit and protec-

tion which such corporations receive from the government and laws of this State in doing business in this State."

A comparison of Chapter 105, Article 3, "Schedule C. Franchise Tax," and Chapter 105, Article 4, "Schedule D. Income Tax" indicates a clear legislative intent to differentiate between these two types of taxes, for a clear distinction has been made by the General Assembly of this State between an excise tax imposed on domestic and foreign corporations for the privilege of transacting business within the State, and an income tax on net corporate income, which is based on a past fact of earned net profits. The agreed stipulation of facts clearly shows that the taxes assessed and paid in the instant case were imposed on that part of plaintiff's net income earned within North Carolina by reason of its interstate business, and fairly attributable to its interstate business done or performed within the borders of the State of North Carolina. The statutes under which these taxes were assessed against plaintiff in precise words preclude a contention that it was the legislative intent that the taxes assessed and paid here were excise or privilege taxes.

When we consider a claim of immunity from taxation, we must come to grips with realities, not shadows. The taxes assessed and collected in the instant case are not in form nor in substance taxes on interstate commerce; nor are they taxes on gross income, nor are they franchise taxes. The taxes here assessed at a nondiscriminatory rate, and paid, were imposed upon that part of plaintiff's net income earned within North Carolina by reason of its interstate business, and reasonably attributable to its interstate business done or performed within the borders of the State of North Carolina. If plaintiff should have no net income earned within North Carolina by reason of its interstate business, and reasonably attributable to its interstate business done or performed within the borders of the State of North Carolina, it could not be required to pay income tax to the State of North Carolina.

In discussing the Commerce Clause of the Federal Constitution, Article I, section 8, (3), we deem this language in *Freeman v. Hewit*, 329 U.S. 249, 91 L. Ed. 265, pertinent: "The power of the States to tax and the limitations upon that power imposed by the Commerce Clause have necessitated a long, continuous process of judicial adjustment. The need for such adjustment is inherent in a federal government like ours, where the same transaction has aspects that may concern the interests and involve the authority of both the central government and the constituent States. The history of this problem is spread over hundreds of volumes of our Reports. To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future. Suffice it to say that especially

in this field opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts."

In considering the question before us for decision, we must remember that when Chief Justice Marshall presided over the United States Supreme Court, there was no such thing in this nation as an income tax.

We find this language in *U. S. Glue Co. v. Town of Oak Creek,* 247 U. S. 321, 62 L. Ed. 1135: " . . . in *Peck & Co. v. Lowe,* (decided May 20th last) 247 U. S. 165, 38 Sup. Ct. Rep. 432, (62 L. Ed. 1049), we held that the Income Tax Act of October 3, 1913, chap. 16 . . . , when carried into effect by imposing an assessment upon the entire net income of a corporation, approximately three-fourths of which was derived from the export of goods to foreign countries, did not amount to laying a tax or duty on articles exported within the meaning of Article I, section 9, cl. 5 of the Constitution. The distinction between a direct and an indirect burden by way of tax or duty was developed, and it was shown that an income tax laid generally on net incomes, not on income from exportation because of its source or in the way of discrimination, but just as it was laid on other income, and affecting only the net receipts from exportation after all expenses were paid and losses adjusted and the recipient of the income was free to use it as he chose, was only an indirect burden. . . . A tax upon the net profits has not the same deterrent effect, since it does not arise at all unless a gain is shown over and above expenses and losses, and the tax cannot be heavy unless the profits are large. Such a tax, when imposed upon net incomes from whatever source arising, is but a method of distributing the cost of government, like a tax upon property, or upon franchises treated as property; and if there be no discrimination against interstate commerce, either in the admeasurement of the tax or in the means adopted for enforcing it, it constitutes one of the ordinary and general burdens of government, from which persons and corporations otherwise subject to the jurisdiction of the States are not exempted by the Federal Constitution because they happen to be engaged in commerce among the States."

In *Graves v. New York,* 306 U.S. 466, 83 L. Ed. 927, 120 A.L.R. 1466, it was held that the imposition by the State of New York of a nondiscriminatory income tax on the salary of plaintiff, an employee of the Home Owners' Loan Corporation, an instrumentality of the Federal Government, did not place an unconstitutional burden on the Federal Government, where Congress has not conferred on the salaries of such instrumentality an immunity from state taxation. The Courts said: "And when the national government lawfully acts through a corporation which it owns and controls, those activities are governmental functions entitled to whatever tax immunity attaches to those

functions when carried on by the government itself through its departments. . . . The present tax is a nondiscriminatory tax on income applied to salaries at a specified rate. It is not in form or substance a tax upon the Home Owners' Loan Corporation or its property or income, nor is it paid by the corporation or the government from their funds. It is measured by income which becomes the property of the taxpayer when received as compensation for his services; and the tax laid upon the privilege of receiving it is paid from his private funds and not from the funds of the government, either directly or indirectly. The theory, which once won a qualified approval, that a tax on income is legally or economically a tax on its source, is no longer tenable." The Court's opinion closes with these words: "The immunity is not one to be implied from the Constitution, because if allowed it would impose to an inadmissible extent a restriction on the taxing power which the Constitution has reserved to the state governments." See *Soltero v. Descartes*, 192 Fed. 2d 755.

Plaintiff relies upon *Spector Motor Service, Inc. v. O'Connor*, 340 U. S. 602, 95 L. Ed. 573. The basis of the decision in that case was not the fact that the foreign corporation was solely engaged in interstate commerce, but was that a tax, measured by the net income received from business transactions within the State of Connecticut, which tax as construed by the Connecticut Court, attached solely to the franchise of petitioner to do interstate business, even though it be fairly apportioned and nondiscriminatory, may not be imposed on the privilege of engaging in business in Connecticut that is exclusively interstate in nature. The Connecticut Supreme Court, *Spector Motor Service v. Walsh*, 135 Conn. 37, 61 A. 2d 89, construed its statute as "a tax or excise upon the franchise of corporations for the privilege of carrying on or doing business in the state, whether they be domestic or foreign." The United States Supreme Court manifestly accepted this construction by the Supreme Court of Connecticut as controlling its interpretation of the state statute. In *Memphis Natural Gas Co. v. Stone*, 335 U. S. 80, 92 L. Ed. 1832, the Court said: "As we are bound by the construction of the state statute by the state court, it is idle to suggest that the tax is on 'the privilege of engaging in interstate business.'" Since the tax imposed in the *Spector* case was for the *privilege* of engaging in interstate commerce, it violated the Commerce Clause of the Federal Constitution.

The Court in the majority opinion in the *Spector* case pointed out that "the question whether a state may validly make interstate commerce pay its way depends first of all upon the constitutional channel through which it attempts to do so." The Court further on in the majority opinion uses this significant language: "The State is not precluded from imposing taxes upon other activities or aspects of this

business which, unlike the privilege of doing interstate business, are subject to the sovereign power of the State. Those taxes may be imposed although their payment may come out of the funds derived from petitioner's interstate business, provided the taxes are so imposed that their burden will be reasonably related to the powers of the State and nondiscriminatory."

The language of the United States Supreme Court in the *Spector* case shows that the tax imposed in that case is entirely different from the tax imposed in the instant case. The incidence of the present tax is that part of plaintiff's net income earned within North Carolina by reason of its interstate business, and reasonably attributable to its interstate business done or performable within the borders of North Carolina, and not upon the franchise of plaintiff to engage in interstate business in North Carolina.

Defendant further relies on *Railway Express Agency, Inc. v. Virginia,* 347 U.S. 359, 98 L. Ed. 337, and quotes this part of the majority opinion: "It is enough to say that we recently have ruled that local incidents such as gathering up or putting down interstate commodities as an integral part of their interstate movement are not adequate grounds for a state license, privilege or occupation tax." That case is distinguishable from the instant case, in that it involved a privilege tax and the formula imposed for assessment. It does not mention income taxes, nor does it abandon the local incident theory. Almost the closing words of the majority opinion are: "We think we can only regard this tax as being in fact and effect just what the Legislature said it was— a privilege tax, and one that cannot be applied to an exclusively interstate business." In addition, plaintiff's business in North Carolina, as shown by the agreed stipulation of facts, is more than the gathering up or putting down interstate commodities.

Plaintiff also relies upon the relatively recent case of *Com. of Pennsylvania v. Eastman Kodak Co.,* 385 Pa. 607, 124 A. 2d 100. That case is distinguishable. The Court said: "Notwithstanding the fact that the Act seeks to impose what it calls a property tax, it is clear that the tax, at least as far as the present defendant is concerned, is an excise tax for the privilege of doing business in Pennsylvania."

As stated in the *Spector* case in the United States Supreme Court, that Court has consistently struck down, under the Commerce Clause of the Federal Constitution, states taxes upon the privilege of carrying on a business that is exclusively interstate in character.

In *Wisconsin v. Minnesota Min. & Mfg. Co.,* 311 U. S. 452, 85 L. Ed. 274, the majority opinion said: "The Commerce Clause is invoked. But it is too late in the day to find offense to that Clause because a state tax is imposed on corporate net income of an interstate enterprise

which is attributable to earnings within the taxing state, *Matson Nav. Co. v. State Bd. of Equalization*, 297 U. S. 441, 80 L. Ed. 791." Four judges dissented for the reason stated in the dissenting opinion in *Wisconsin v. J. C. Penney Co.*, 311 U. S. 435, 85 L. Ed. 267, 130 A. L. R. 1229. The dissenting opinion in the *Penney* case, written by Mr. Justice Roberts, was based in part on the fact that the tax exacted was not called an income tax, and had been "held by the highest court of Wisconsin not to be an income tax but an excise upon a privilege." The dissenting opinion has this statement: "The respondent admittedly receives income in Wisconsin. No one questions the power of Wisconsin to lay a tax upon the receipt of that income." The majority opinion in the *Wisconsin v. Penney* case says: "For many years, corporations chartered by other states but permitted to carry on business in Wisconsin have been subject to a general corporate income tax act on earnings attributable to their Wisconsin activities. The state has, of course, power to impose such a tax. *United States Glue Co. v. Oak Creek*, 247 U. S. 321, 62 L. Ed. 1135, 38 S. Ct. 499, Ann. Cas. 1918E 748; *Underwood Typewriter Co. v. Chamberlain*, 254 U. S. 113, 65 L. Ed. 165, 41 S. Ct. 45."

In *Underwood Typewriter Co. v Chamberlain*, 254 U. S. 113, 65 L. Ed. 165, the Court said: "This tax is based upon the net profits earned within the state. That a tax measured by net profits is valid, although these profits may have been derived in part, or indeed mainly, from interstate commerce, is settled."

In *Memphis Natural Gas Co. v. Stone, supra*, the State of Mississippi imposed a state franchise tax measured by the value of capital used, invested or employed in the State, upon a pipeline company, a part of whose pipeline passes through the State but which does no intrastate business and has never qualified therefor under the laws of the State. The Memphis Natural Gas Company is a Delaware corporation which owns and operates a pipeline for the transportation of natural gas. The line runs from the Monroe Gas Field in the State of Louisiana through the States of Arkansas and Mississippi to Memphis and other points in the State of Tennessee. Approximately 135 miles of the pipeline lie within Mississippi; at two points within that State there are compressing stations. It was stipulated that the Gas Company has never engaged in any intrastate commerce in Mississippi; that it has only one customer within the State, the Mississippi Power and Light Company, to which it sells gas from its interstate line at wholesale from several delivery points; that the Gas Company has never qualified under the laws of Mississippi to do intrastate business within that State; that it has no agent for the service of process and that it has no office within the State; and that its only employees and repre-

sentatives in Mississippi are those necessary to maintain the pipeline and its auxiliary appurtenances. The Gas Company has paid all ad valorem taxes assessed against its property in Mississippi pursuant to the State law. The Supreme Court of the State of Mississippi in 201 Miss. 670, 29 So. 2d 268, approved the imposition of the tax and construed the state tax as "an exaction . . . as a recompense . . . protection of . . . the local activities in maintaining, keeping in repair, and otherwise in manning the facilities of the system throughout the 135 miles of its line in this State." The attack on the Mississippi statute was that it violated the Commerce Clause of the Federal Constitution by putting a tax on the commerce itself. The Court's opinion, after reviewing many of its prior decisions, and after citing in a note to its opinion its cases in which local incidents formed a sound basis for taxation by a State of a foreign corporation doing interstate business, affirmed the decision of the Supreme Court of Mississippi, and closed its opinion with these words: "The Mississippi excise has no more effect upon the commerce than any of the instances just recited. The events giving rise to this tax were no more essential to the interstate commerce than those just mentioned or ad valorem taxes. We think that the state is within its constitutional rights in exacting compensation under this statute for the protection it affords the activities within its borders. Of course, the interstate commerce could not be conducted without these local activities. But that fact is not conclusive. These are events apart from the flow of commerce. This is a tax on activities for which the state, not the United States, gives protection and the state is entitled to compensation when its tax cannot be said to be an unreasonable burden or a toll on the interstate business."

In *Memphis Natural Gas Co. v. Beeler*, 315 U. S. 649, 86 L. Ed. 1090, Chief Justice Stone, speaking for the Court, said: "In any case, even if taxpayer's business were wholly interstate commerce, a non-discriminatory tax by Tennessee upon the net income of a foreign corporation having a commercial domicile there, . . . , or upon net income derived from within the state, citing numerous cases, is not prohibited by the commerce clause on which alone taxpayer relies. Many cases are cited." In a note to the opinion of the United States Supreme Court in the *Spector* case, it is said that "any suggestion in that opinion (the *Beeler* case) as to the possible validity of such a tax if applied to earnings derived *wholly* from interstate commerce is not essential to the decision in the case." (Emphasis ours). In the instant case the income taxes imposed on plaintiff were not on its *whole income* derived from interstate commerce, but only on that part of its net income earned within the State of North Carolina by reason of its interstate business, and reasonably attributable to its

interstate business done or performed within the borders of the State of North Carolina.

In *McGoldrick v. Berwind-White Coal Min. Co.*, 309 U. S. 33, 84 L. Ed. 565, 128 A. L. R. 876, the Court said: "But it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business. Citing authority. Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress. A tax may be levied on net income wholly derived from interstate commerce."

*Atlantic Coast Line R. Co. v. Daughton, Norfolk Southern R. Co. v. Daughton, Seaboard Air Line R. Co. v. Daughton, Southern R. Co. v. Daughton*, 262 U. S. 413, 67 L. Ed. 1051, were appeals by complainants from decrees of the District Court of the United States for the Eastern District of North Carolina, dismissing the bills filed to enjoin the enforcement of an income tax by the State of North Carolina. The applicable income tax law in North Carolina at that time, as stated in the opinion, was as follows: "The Constitution of North Carolina (art. 5, sec. 3, as amended January 7, 1921) authorizes the general assembly to tax incomes at a rate not exceeding 6 per cent. The Income Tax Act of March 8, 1921 (Revenue Act, chap. 34, Schedule D, sections 100-904, as amended by chap. 35, Public Laws 1921), laid upon corporations a tax equal to 3 per cent of the entire net income as therein defined, and upon individuals a progressive tax not exceeding that percentage. For the purpose of ascertaining the taxable income the statute divides taxpayers into three classes,—individuals, ordinary corporations, and public service corporations (including railroads). The statute, in terms, taxes only net income. For railroads and other public service corporations required to keep accounts according to the method established by the Interstate Commerce Commission, it makes those accounts the basis for determining the 'net operating income' (Sec. 202, as amended); and it directs that, in order to ascertain the 'net income,' there shall be deducted from the net operating income, (a) uncollectable revenue; (b) taxes for the income year, other than income taxes and war profits and excess profits taxes; (c) amounts paid for car hire. Whether the statute is unconstitutional, because it fails to include among the deductions from income allowed public service corporations the capital charges, including other rentals paid, is the main question for decision." The appellants conceded that taxation of the net income of an interstate carrier does not violate the Com-

merce Clause. The State conceded that taxation of gross receipts would be void as burdening interstate commerce. The decision of the District Court was affirmed. In its opinion the United States Supreme Court said: "Under the commerce clause it is essential that a state tax shall not directly burden interstate commerce and that it shall not discriminate against interstate commerce. With these essentials the North Carolina Act complies. It is not assessed on gross receipts. Citing authority. It does not discriminate against interstate commerce. For the taxable net income of other public service corporations which are wholly intrastate is determined also without allowing capital charges as a deduction. That there is no basis for the claim that the commerce clause is violated by the burden resulting from the aggregate of the several North Carolina railroad taxes was settled in *Southern R. Co. v. Watts*, 260 U.S. 519, ante 375, 43 Sup. Ct. Rep. 192, (67 L. Ed. 375)." The third headnote in the case as reported in 67 L. Ed. 1051 is: "The imposition of a tax by a state upon the net income of an interstate railroad from operations within the state, without allowing deduction for payments of interest and rent, which are in fact capital charges, does not violate the interstate commerce provision of the Federal Constitution."

The Supreme Court of California, sitting in banc, in *West Pub. Co. v. McColgan*, 27 Cal. 2d 705, 166 P. 2d 861, upheld in a learned and convincing opinion the right of the State of California to collect an income tax from the West Publishing Company, which was engaged in interstate commerce, and had not qualified to do intrastate business in California, based on the West Publishing Company's net income derived within the State. The judgment of the California Supreme Court was affirmed by the Supreme Court of the United States on 10 June 1946, 328 U.S. 823, 90 L. Ed. 1603, and a rehearing was denied by it on 14 October 1946, 329 U. S. 822, 91 L. Ed. 699. To the same effect see the elaborate and scholarly opinions in *Fontenot v. John I. Hay Company*, 228 La. 1031, 84 So. 2d 810; and in *State v. Northwestern States Portland Cement Co.*, ........Minn. ......., 84 N.W. 2d 373. In the last case on 6 January 1958 probable jurisdiction was noted by the United State Supreme Court. 355 U.S. 911, 2 L. Ed. 2d 272. For a comment on the *West Publishing Company* case, the case of *Memphis Natural Gas Co. v. Stone*, and the *Spector* case in the United States Supreme Court, see Kraus, The Implications of the *Spector Motor Service* Case, 56 Dickinson Law Review 107-115.

There is no challenge here that the provisions of our Income Tax Act pertinent to the question before us are discriminatory against interstate commerce, nor are the *amounts* of the income taxes imposed on plaintiff assailed, nor the method of computation of such taxes.

In the light of the legislative intent, as well as the carefully re-

stricted impact of our Income Tax Act as it is applicable to plaintiff, and by virtue of the authorities above set forth, we can only conclude, that the North Carolina statutes, under which the income taxes were imposed on plaintiff in the instant case, do not constitute a burden on interstate commerce, and do not violate the Commerce Clause of the Federal Constitution.

Plaintiff's second and last contention is that the collection of the income taxes from plaintiff violates "the due process of law" phrase of the 14th amendment to the Federal Constitution, and "the law of the land" phrase of Art. I, Sec. 17, of the North Carolina Constitution.

"The term 'law of the land' (as used in Art. I, Sec. 17, of the State Constitution) is synonymous with 'due process of law,' a phrase appearing in the Federal Constitution and the organic law of many states." *S. v. Ballance*, 229 N. C. 764, 51 S.E. 2d 731, 7 A. L. R. 2d 407.

On the question of due process of law the United States Supreme Court in upholding the assessment for local ad valorem taxes of vessels owned by a carrier engaged in interstate commerce and used within the taxing State, where such assessment is based on the ratio between the total number of miles of the carrier's lines in Louisiana and the total number of miles of the entire line, said in *Ott v. Mississippi Valley Barge Line Co.*, 336 U.S. 169, 93 L. Ed. 585: "The problem under the Commerce Clause is to determine 'what portion of an interstate organism may appropriately be attributed to each of the various states in which it functions.' Citing authority. So far as due process is concerned the only question is whether the tax in practical operation has relation to opportunities, benefits, or protection conferred or afforded by the taxing State. Citing authority. Those requirements are satisfied if the tax is fairly apportioned to the commerce carried on within the State. There is such an apportionment under the formula of the *Pullman* Case. Moreover, that tax, like taxes on property, taxes on activities confined solely to the taxing State, or taxes on gross receipts apportioned to the business carried on there, has no cumulative effect caused by the interstate character of the business. Hence there is no risk of multiple taxation. Finally, there is no claim in this case that Louisiana's tax discriminates against interstate commerce. It seems therefore to square with our decisions holding that interstate commerce can be made to pay its way by bearing a nondiscriminatory share of the tax burden which each State may impose on the activities or property within its borders."

In *Miller Bros. Co. v. Maryland*, 347 U. S. 340, 98 L. Ed. 744, the Court said: ". . . due process requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax."

The agreed stipulation of facts shows that plaintiff engages in sub-

stantial income producing activities in North Carolina. Plaintiff rents and maintains freight terminals in various places in the State for its interstate operations, for which terminals it paid in rent for its fiscal year ending 30 June 1955 the sum of $21,911.00, and a similar rent for its fiscal year ending 30 June 1956. It owns and operates pickup and delivery trucks in North Carolina for use at its terminals, and owns furniture, fixtures and equipment in its terminals in North Carolina for use in its business in North Carolina. Its delivery trucks pick up interstate freight from its customers in North Carolina destined for or consigned to points or parties outside of North Carolina, and take such freight to its terminals in North Carolina. When freight is received at its various terminals in North Carolina, it is delivered to the consignees, either direct from the interstate vehicles, or in delivery trucks stationed at the respective terminals. Its terminals in North Carolina are manned by its employees, who usually live in North Carolina. The agreed stipulation of facts does not state the number of such employees in North Carolina, nor the total amount of their salaries, nor the number of plaintiff's terminals in North Carolina, nor the number of its delivery trucks at its terminals in North Carolina, nor the amount of money it receives in North Carolina for bringing in or carrying out freight. However, it would seem from a consideration of the entire agreed stipulation of facts that the number of plaintiff's employees at its terminals in North Carolina, their salaries, the number of its delivery trucks there stationed, and the money it collects in North Carolina in its business, are considerable. The State of North Carolina provides a place and opportunity for plaintiff's employees in North Carolina to solicit business, and make contracts for plaintiff in North Carolina to carry freight for its residents out of North Carolina, and they undoubtedly made such contracts for plaintiff, in competition with other interstate carriers by railroads, express, etc., operating in North Carolina. The State of North Carolina protects plaintiff's business transactions and property within its borders, for instance, against vandalism, larceny, etc., and maintains courts in which plaintiff can enforce payment for the transportation of articles it brings within this State to its customers here, and for the transportation of articles which it carries out of this State for residents here. The business of plaintiff carried on in North Carolina was neither irregular nor casual. It was systematic and continuous throughout the periods of time in question. There are incidents in the carrying on of plaintiff's business taking place in North Carolina, and only here, for which the State of North Carolina affords protection received from no other State, or the United States. Nor can any other State give that protection.

The activities of the International Shoe Company in the State of

Washington, as described in *International Shoe Co. v. Washington*, 326 U. S. 310, 90 L. Ed. 95, 161 A. L. R. 1057, which served as the constitutional basis for the imposition of the tax there involved, were, it seems, in substance no more extensive than the activities of plaintiff in North Carolina.

In *Memphis Natural Gas Co. v. Stone, supra,* we have stated the facts of that case, as they appear in the United States Supreme Court Reports. Certainly the business acts of the Gas Company in Mississippi in that case are not greater than the business acts of plaintiff in North Carolina. In the *Gas Company* case the United States Supreme Court said: "There is no question here of Due Process. The Gas Company's property is in the taxing state where the taxable incidents occurred."

The activities of the West Publishing Company in California, where it had not qualified to do intrastate business, as set forth in *West Publishing Co. v. McColgan, supra,* do not seem to be more extensive than the activities of plaintiff in North Carolina. See also *Fontenot v. John I. Hay Company, supra.* See also *McGee v. International Life Ins. Co.,* 355 U.S. ......, 2 L. Ed. 2d 223, where the Court held that it is sufficient for purposes of due process that a suit against a nonresident not served with process within the forum State is based upon a contract which has substantial connection with that State.

In the collection of the income taxes from plaintiff in the instant case, we find no violation of "the due process of law" provision of the 14th amendment to the Federal Constitution, and of "the law of the land" provision of Art. I, Sec. 17, of the North Carolina Constitution.

Under our dual system of government, the exercise of the taxing power is equally essential to the United States and to the constituent States. Under the facts of this case we conclude that it is clearly manifest that the State of North Carolina has the right to collect the nondiscriminatory income taxes imposed on plaintiff, which taxes were imposed solely on that part of plaintiff's net income earned within the State of North Carolina in its interstate business, and reasonably attributable to its interstate business done or performed within the borders of this State.

The judgment of the trial court is

Affirmed.

RODMAN, J., took no part in the consideration or decision of this case.