CITY OF DURHAM v. SOUTHERN RAILWAY COMPANY, NORFOLK AND WESTERN RAILROAD COMPANY, AND SEABOARD AIR LINE RAILROAD COMPANY.

(Filed 4 April, 1923.)

**1. Mandamus—Municipal Corporations—Cities and Towns—Railroads—Crossings.**

*Mandamus* is the proper remedy for a city to compel a railroad company to observe its ordinance requiring a change from a grade crossing to an underpass of the railroad track with the city streets for the safety of the citizens.

**2. Same—Courts—Chambers—Issues—Questions for Jury—Statutes.**

Under the provisions of C. S., 868, a summons to compel a railroad company to observe a city ordinance requiring it to change its grade crossing with a street to underpass, etc., is returnable before the judge either at chambers or in term, and upon good cause shown he is to determine the facts as well as the law, except where controlling issues of fact are raised, when upon motion of either party it is his duty to continue the action until the issues can be determined by the jury at the next regular term of the court.

**3. Same—Evidence—Ordinances—Burden of Proof.**

Where, after an investigation of the conditions at a grade crossing of railroad tracks with a city street, the city has determined that the crossing is a menace to the life, etc., of its citizens, and has passed an ordinance requiring the railroad company to put in an underpass to remedy the conditions, and has proceeded by *mandamus* to compel the railroad company to comply with the ordinance, the introduction of the ordinance at the hearing is prima facie evidence of the necessity thereof, casting the burden upon the railroad company to show that the ordinance was unreasonable or oppressive.

**4. Same—Pleadings—Questions for Court.**

When the answer and affidavits of a railroad company in *mandamus* proceedings by a city to enforce its ordinance requiring the railroad to change from a grade crossing with its street to an underpass, raises only evidentiary matters on the controlling issues, or as to the extent of the dangerous conditions requiring the change, no issues are raised requiring the intervention of the jury, and the judge before whom the proceedings are returnable will determine the matter. C. S., 868.

**5. Municipal Corporations—Cities and Towns—Police Powers—Public Safety—Corporation Commission—Statutes.**

A city has both inherent and authority by general statute over its streets for the protection of its citizens, which is not taken from it by C. S., 1048, conferring like powers upon the Corporation Commission.

**6. Municipal Corporations—Cities and Towns—Public Safety—Charter Powers.**

A city charter giving a city specific authority to erect gates at a railroad crossing, or to require the railroad company to place a flagman there to warn pedestrians, with provision that such authority shall not be exclu-

sive, does not limit the authority of the city therein, or take from it the inherent and statutory right to require that the railroad company construct an underpass for the protection of the public.

7. **Constitutional Law—Police Powers—Federal Statutes—Municipal Corporations—Cities and Towns.**

The exercise by the State of its power to provide for the safety of its citizens with respect to grade crossings of its street by a railroad company is within its police powers, and may be exercised by municipal corporations under authority conferred on them, and not being delegated to the National Government, it is not affected by Federal legislation upon interstate commerce or the Federal Transportation Act.

APPEAL by defendants from an order for a *mandamus* made by *Connor, J.,* at chambers in Durham, 16 September, 1922.

The plaintiff made application for mandamus to compel the railroad companies to eliminate the grade crossing on Chapel Hill Street over the railway tracks of the defendants, and to build an underpass under said tracks. Chapel Hill Street is one of the main streets for traffic in said city, connecting the northern and southern portions of the city and leading from Durham to Chapel Hill. The three defendant railroads have tracks crossing that street on a grade on which are operated both passenger and freight cars. It is alleged and not denied that in a radius of approximately 800 yards of this Chapel Hill Street grade crossing are located the freight depots of all three defendants, large tobacco plants and factories, ice and power plants, flour mills, hosiery mills, all of which depots and industries are served with side or spur tracks connected with the main line tracks of the defendants over which are operated constantly, during day and night, passenger trains, freight trains, and switching engines.

In paragraph 5 it is alleged that several accidents have occurred at this grade crossing in which people, animals, and vehicles have been injured.

In paragraph 6 it is alleged that the governing authorities of the city of Durham, finding that the continued maintenance of said grade crossing is a great inconvenience to the whole people, seriously interrupting and impeding street traffic, and is dangerous to public travel, employed an expert consulting engineer to advise said governing authorities of the said city if it were practicable and feasible to change or alter said grade crossing in order that the same might be made safe and convenient for the traveling public, and that said engineer, after full investigation, recommended that said grade crossing could best be made safe by separating the street and railroad grades and passing the street underneath the railroad tracks by means of an underpass, and that the said city council invited the defendant to have their representatives meet with it and its representatives with the view of having said defendants remedy

16—185

said grade crossing by the building of an underpass in the place thereof. And that many conferences were held by and between engineers of the city and the defendant companies which resulted in no definite or satisfactory agreement.

In paragraph 7 of the complaint it is alleged that on 20 March, 1922, the city council, the governing authorities of the city of Durham, adopted an ordinance which, after reciting the above facts, directed that the grade crossing should be eliminated by the construction of an underpass for the street, and directing the defendant railroad companies to eliminate said grade crossing and construct the underpass with proper approaches, fixing the width and height of the underpass and its method of construction, and also directing that the said work be begun within 60 days and completed within 280 working days thereafter, and that a copy of said ordinance was duly served upon the said defendant railroad companies.

In paragraph 8 of the complaint it is alleged that the city caused to be made a record of the street traffic along and over said street and over said grade crossing, which record is attached to the exhibits to the complaint, showing an average of nearly 4,000 pedestrians and bicycles had crossed this grade crossing a day; over 500 horse-drawn vehicles, and more than 2,000 passenger automobiles, more than 350 delivery wagons, over 100 heavy trucks, and over 200 street cars; and that there were more 100 times during the same hours, to wit: from 5 o'clock in the morning until 11 o'clock at night, the trains and switch engines crossing Chapel Hill Street blocked the crossing between those hours a total obstruction of 1¾ hours per day.

The railroad companies answered, admitting the averments above recited with the qualification that they did not at *all times* of day and night move the trains over said crossing, and they denied that the crossing at Chapel Hill Street was blocked to the extent alleged in the complaint, and also, in a separate defense, alleged that an overhead bridge would be more economical to construct than an underpass; that the requirement of the building of an underpass was unreasonable and oppressive, and a burden upon interstate commerce, and not permitted by the Transportation Act of Congress, and that the ordinance of the city of Durham was arbitrary and not due process of law, was a violation of the commerce clause of the Constitution, and that the jurisdiction to require the raising or lowering of the tracks at a highway crossing was exclusively with the Corporation Commission of the State of North Carolina.

The railroad companies also moved that the action be continued, and no order be made therein until the issues of fact raised could be decided by a jury at a regular term of the Superior Court of Durham County.

The court overruled the motion, and defendants excepted. From the judgment granting a *mandamus,* the defendants also excepted and appealed.

*S. C. Chambers, J. S. Manning, and W. J. Brogden for plaintiff.*
*Fuller & Fuller, W. B. Guthrie, Manly, Hendren & Womble, L. E. Jeffries, Theodore W. Reath, and James F. Wright for defendants.*

CLARK, C. J. The refusal by the court of the motion to continue the hearing and transfer the case to the civil issue docket of the Superior Court for trial by jury was not erroneous, for no issues of fact are raised by the answer. The defendants rely upon C. S., 868, but the relief sought by the plaintiffs is not for the enforcement of a money demand, and that section authorizes the summons to be returnable before the judge at chambers not less than ten days after service of summons in the complaint, "at which time the court, except for good cause shown, should hear and determine the action both as to law and fact. However, when an issue of fact is raised by the pleading, it is the duty of the court upon the motion of either party to continue the action until the issue of fact can be decided by jury at the next regular term of the court." The contention of the defendants is that the answer raised issues of fact because they qualified their admission of the truth of the averment in paragraph 4 as to the volume of the traffic over this grade crossing to the extent averred in paragraphs 4 and 8 of the complaint; but neither of these denials raised an issue of fact. Neither did the assertion in the answer that the underpass would be more expensive than a bridge, and therefore that the action of the governing authorities of the city of Durham was arbitrary, unreasonable, and oppressive. These defenses raised no issues of fact to be tried by jury, and the latter was a question of fact for the court.

In *Lee v. Waynesville,* 184 N. C., 565, it was held that the courts will not interfere with the statutory discretionary powers given to the governing authorities of an incorporated town to take land from adjoining owners in widening its streets for the public welfare unless their action in doing so is so unreasonable as to amount to an oppressive and manifest abuse of the exercise of this discretion under C. S., 2791, 2792, citing numerous cases.

It is admitted in this case that this Chapel Hill Street is one of the main streets and most important thoroughfares in the city of Durham, connecting, as it does, the northern and southern sections of the city, and is the thoroughfare leading from Durham to Chapel Hill. It is traversed by thousands of people daily, and the question whether or not the public safety demanded elimination of the grade crossing was one in the

legislative power of the governing authorities of the city of Durham, and their decision is conclusive and final, unless it was shown that it is clearly oppressive or amounts to abuse of their discretion. The denial as to the number of times a day the crossing was broken by passenger and freight trains or switch engines, and of the exact number of pedestrians, bicycles, automobiles and other vehicles crossing per day is clearly a mere evidentiary matter, and does not constitute issues of fact in view of the admission that Chapel Hill Street is one of the main streets or thoroughfares in said city, over which so large a volume of traffic and travel passes every day. This Court has repeatedly held that mere evidentiary matters do not raise issues of fact. This is clearly stated in *Edgerton v. Kirby*, 156 N. C., 347, and also in *Jackson v. Tel. Co.*, 139 N. C., 347, in which the Court said: "We do not approve of issues which, as in this case, embody evidentiary facts instead of the ultimate facts to be found by the jury, and which are, therefore, the only issuable facts. *Grant v. Bell*, 87 N. C., 34; *Patton v. R. R.*, 96 N. C., 455."

The city made out a prima facie case when it showed the enactment and passage of the ordinance, which was admitted by the three railroads. The judge properly held that a presumption existed in favor of the validity of the ordinance, and the burden was upon the railroads to show otherwise, which they declined to do. The judge was ready to hear and determine the action, but the railroads failed to offer testimony or evidence of any kind whatever. It did not devolve upon the city to prove that the crossing was blocked on the dates mentioned to the exact extent as alleged in the complaint, as the burden of proving the ordinance invalid or unreasonable was on the defendants either by showing that in fact the railroads did not block the crossing; that traffic was not impeded, and that the crossing is not dangerous. That the governing body exceeded its powers, or committed fraud and oppression, constituting a manifest abuse of discretion are questions of law for the court. The burden is upon the defendants to show affirmatively that there was an abuse of discretion and that the ordinance was unreasonable and oppressive. The reasonableness of a city ordinance is a question of law for the court. *Crotts v. Winston-Salem*, 170 N. C., 27; *Small v. Edenton*, 146 N. C., 527; *Tate v. Greensboro*, 114 N. C., 399. There must be sufficient facts alleged to show that the ordinance is unreasonable and oppressive before it can become an issue of fact for the jury.

The defendants contend, however, that by reason of the enumeration of certain powers in the city charter, among others, "To require railroad companies to erect gates at crossings or to place flagmen to warn the public of the approach of trains," restricted the city's right to exercise only the powers specifically mentioned, and that C. S., 1048, confers upon the Corporation Commission sole jurisdiction over the subject-matter of

this controversy. But the last paragraph of section 48 of the city charter recites that the powers enumerated therein "shall not be held or deemed to be exclusive"; that it shall have all the powers conferred by the several statutes applicable.

This question, which is the one most relied upon by the defendants in this cause, was fully settled in *R. R. v. Goldsboro,* 155 N. C., 362, where this Court said: "The plaintiff earnestly contends that inasmuch as Rev., 1097 (10) (now C. S., 1048), authorized the Corporation Commission to require the raising or lowering by a railroad of its track or highway at any crossing, and to designate who shall pay for the same, this deprives the city of Goldsboro of the right to exercise its police power in that regard. The provision just cited giving the Corporation Commission the power stated is not in derogation of that conferred in the charters of towns and cities, but is supplementary merely." In that case, *R. R. v. Goldsboro, supra,* the exact point is so fully and clearly discussed with citations of Federal decisions and decisions from other states that it is unnecessary to repeat what is there said.

Our decision in that case was affirmed on a writ of error, *R. R. v. Goldsboro,* 232 U. S., 548, and in the citations at the end of that opinion in the Anno. Ed.

Since that volume was annotated, the case has since been reaffirmed in *Borden v. R. R.,* 175 N. C., 179; *Powell v. R. R. (Hoke, J.),* 178 N. C., 245; *In re Utilities Co.,* 179 N. C., 159, 160; *Goff v. R. R., ibid,* 224; *Raleigh v. Power Co. (Brown, J.),* 180 N. C., 237; *Durham v. Public Service Co.,* 182 N. C., 338.

The findings of fact by the city in the exercise of its legislative and police powers make out a prima facie case, and the railroads failed to offer any testimony or evidence to show abuse of discretion or unreasonableness. Only two questions can arise: (1) Did the city possess the power to enact the ordinance? (2) Is the ordinance a reasonable exercise of the power?

Full power has been conferred upon the governing body of the city to enact such ordinances as are necessary to promote and safeguard the health, safety, and general welfare of the public. Besides the powers expressly given in the charter, the city possesses the powers conferred by Laws 1917, ch. 136, and the last paragraph of section 48 of the charter of Durham, Private Laws 1921, ch. 42, reads as follows: "The enumeration of particular powers by this charter shall not be held or deemed to be exclusive, but in addition to the powers enumerated or implied herein, the city of Durham, either through its city council or through such other officers as may be provided, shall have and may exercise all other powers which under the Constitution and laws of North Carolina now are or hereafter may be granted to cities."

DURHAM *v.* R. R.

The city having exclusive control of its streets, the question in the first instance was one for the local authorities. McQuillan—7 Municipal Corporations, sec. 955.

In *St. Paul v. R. R.,* L. R. A., 1917 C, 1174, the Court said: "The determination that public necessity requires a separation of crossing grades and the method of accomplishing it, is in the first instance a legislative act for the common council"; and further, "The separation of grades may be effected either by compelling the railroad to depress its tracks and carry the street over them, or by compelling it to carry the street over or under the crossing grade of the railroad, as reasonable public necessity may require."

The ordinance in this case was enacted under an exercise of the police power and authority conferred in the charter and the several statutes applicable.

In *Powell v. R. R.,* 178 N. C., 245, this Court said: "The right of the city government, both under its police powers and the several statutes applicable, to require railroads to construct bridges along streets running over their tracks, is fully established in this jurisdiction, and is recognized in well considered cases elsewhere."

In *Minneapolis v. R. R.,* 28 L. R. A. (N. S.), 306, the Court said: "The tendency of modern development is in the direction of greater, rather than more restricted, use of police power, and necessarily so in order to meet the new dangers, and increase of old dangers, constantly occurring as natural incidents of advancing civilization. We think the weight of modern authority is in accord with the views just expressed, and to the effect that everything that goes to make a crossing safe for public use is as essentially within police regulations as any part of it." This was cited in *R. R. v. Goldsboro,* 155 N. C., at p. 360 (affirmed on writ of error, U. S. Supreme Court, 232 U. S.).

*R. R. v. Goldsboro, supra,* was cited with approval in *R. R. v. Omaha,* 235 U. S., 121, where it is held: "A railway company may, consistently with due process of law, be required by the State, or by a duly authorized municipality acting under its authority, to construct overhead crossings or viaducts at its own expense, the consequent cost to the company being as a matter of law *damnum absque injuria,* are deemed to be compensated by the public benefit which the company is supposed to share. . . . The necessity of the viaduct and the manner of its construction were primarily vested in the discretion of the city authorities . . ."

In *R. R. v. Minneapolis,* 115 Minn., 460, Ann. Case., 1912-D, 1029, the Court says: "The general rule so established is that where the safety, convenience, or welfare of the public require that a railway company carry its tracks over a public way, or the public way over its tracks, by a bridge, the uncompensated duty of providing such bridge devolves

upon the railway company. The basis of this rule is the superior nature of the public right inherent in the reserved police power of the State. A railroad, though constructed first in time, is constructed subject to the implied right of the State to lay out and open new highways crossing its right of way. If the operation of the railway upon a particular surface, or with a particular form of support for its tracks, interferes with the public safety, convenience, or welfare in the exercise of the public right to the use of such highway, then upon the railway company is placed the burden of making such necessary and reasonable adjustment of its tracks as will permit the exercise of the superior public right."

The Supreme Court of the United States, in affirming *R. R. v. Goldsboro,* 232 U. S., 430, says: "It is well settled that railroad corporations may be required at their own expense, not only to abolish existing grade crossings, but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks, or to carry their tracks over such highways."

In the recent case of *R. R. v. Utility Comrs.,* 254 U. S., 394, *Mr. Justice Holmes,* speaking for the Court, says: "Grade crossings call for a necessary adjustment of two conflicting interests—that of the public using the streets and that of the railroads and the public using them. Generically the streets represent the more important interest of the two. There can be no doubt that they did when these railroads were laid out, or that the advent of automobiles has given them an additional claim to consideration. They always are the necessity of the whole public, which the railroads, vital as they are, hardly can be called to the same extent. Being places to which the public is invited, and that it necessarily frequents, the State, in care of which this interest is and from which ultimately the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. That is one of the most obvious cases of the police power, or to put in the same proposition in another form, the authority of the railroad to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires. It is said that if the same requirement were made for the other grade crossing of the road it would soon be bankrupt. That the states might be so foolish as to kill a goose that lays golden eggs for them has no bearing on their constitutional rights. If it reasonably can be said that safety requires the change it is for them to say whether they will insist upon it, and neither prospective bankruptcy nor engagement in interstate commerce can take away this fundamental right of the sovereign of the soil."

DURHAM *v.* R. R.

As held in *Superior v. Roemer,* 154 Wis., 250, a railroad company is bound by the rules of common law to build, at its own expense, a viaduct necessitated by the construction of its railroad across an existing highway, and a city, in the authorized exercise of the police power, may require a railroad company to construct the necessary viaduct: "Whenever it is reasonably necessary for the convenience and safety of the traveling public, it is the duty of a railroad company to viaduct or bridge its tracks at their intersection with streets. This duty exists at common law." *S. v. R. R. Co.,* 122 Minn., 280.

In *R. R. v. Railroad Commission,* 176 Ind., 428, which was a suit to compel the railroad company to separate a grade crossing by constructing the highway under the grade of the railroad, the Court said: "It is well settled in this State that the right of a railroad company to cross a highway with its tracks carries with it the duty on the part of the company to restore the highway to and keep it in its former condition of usefulness and safety, and if this cannot be done by a grade crossing, the company must do it either by constructing its tracks over or under the highway, or the highway over or under its tracks."

In *R. R. v. State,* 158 Ind., 189, the Court held that when a grade crossing as constructed by a railroad company is dangerous to life and property, and interferes with the free use of the highway, the railroad company may be compelled to construct a crossing under the railroad, if that is necessary to afford security to life and property, and to place the highway in such condition as not unnecessarily to impair its usefulness, or interfere with the free use thereof, as required by law.

In *R. R. v. Hopkins County,* 153 Ky., 718, the Court held that a railroad company may be required to carry its own tracks over a highway by means of a bridge, and that this rule applied to all cases where public safety, convenience, or public welfare required such bridge.

In *Denver v. R. R.,* 20 Colo., 186, it was conceded that a state or duly authorized municipality, has power to compel a railroad company to construct a viaduct along a street over its tracks, provided there is reasonable public necessity therefor.

In *People v. R. R.,* 149 N. Y. Supp., 315, the Court says: "That the State has a right to compel a railroad company at its own expense to eliminate crossings at grade by a depression of its tracks and the erection of bridges to carry streets over its right of way is too well recognized to admit of discussion."

The State, in the exercise of the police power, may authorize a city to require a railroad company to construct at its own expense such viaducts over its tracks at street crossings as may be necessary for the safety and protection of the public. *Omaha v. R. R.,* 94 Neb., 556.

In *Chattanooga v. R. R.,* 128 Tenn., 399, the Court held that under the common law a city could require a railroad to construct and maintain at its expense a proper bridge at a street crossing over its tracks, and stated that it was so held in 1859 in *R. R. v. State,* 3 Head (Tenn.), 523, and in *Dyer Co. v. R. R.,* 87 Tenn., 712.

The defendants having failed to comply with the terms of the ordinance, *mandamus* was the proper remedy to pursue. "Where it is the duty of a railroad company to construct a viaduct or bridge over its tracks, it may be compelled to do so by *mandamus.* This duty may exist and be enforced by *mandamus,* even though there is no express provision in the charter or statute in regard to the erection of viaducts or bridges. It may arise out of, or be embraced in the duty to restore and keep the highway in repair. Thus, in a leading case, it appeared that the railroad company's charter empowered the company to lay its tracks across any public highway or street, in such condition or state of repair as not to impair or interfere with its free and proper use. It was held that this was a continuing duty, and although the crossing might have been adequate when constructed, yet, by reason of the increase of business of the railroad, or of travel upon the street, the crossing became dangerous, or obstructed such travel, the company was bound to provide some other mode of crossing; and as it appeared that the only safe and convenient mode was to carry the street by viaduct under the tracks it was further held that the *mandamus* would lie to compel the railroad to construct such viaduct, including the abutments and approaches as well as the bridge for the tracks." Elliott on Railroads, vol. 3, sec. 1111.

Appellants contend that the ordinance is void for that compliance with same would not be that efficient and economical management and a reasonable expenditure for structures by the carriers as required by subdivision 2, section 15a of the Interstate Commerce Act, as amended by the Transportation Act. But nothing in the Interstate Commerce Act or the Transportation Act contravenes the right of the State to invoke the supreme law—an inherent right—to legislate in the interest of public safety.

In *Glenn v. Express Co.,* 170 N. C., 293, *Justice Allen* quotes from *Sherlock v. Alling,* 93 U. S., 99, approved in *Plumly v. Mass.,* 155 U. S., 473, as follows: "In conferring upon Congress the regulation of commerce, it was never intended to cut the states off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." Continuing, *Justice Allen* said: "The police power is one originally and always belonging to the states, and was not surrendered by them to the general Government."

As *Justice Holmes* said in *R. R. v. Comrs.,* 254 U. S., 410: "To engage in interstate commerce, the railroad must get on the land; and, to get on to it, must comply with the conditions imposed by the state for the safety of its citizens."

Affirmed.