CITY OF WINSTON-SALEM v. SOUTHERN RAILWAY COMPANY.

(Filed 17 September, 1958)

**1. Municipal Corporations § 36—**

A statute authorizing the city to require a railroad company, at its own expense, to construct and repair overpasses and street crossings is a delegation to the city of a part of the State's sovereign police power.

**2. Constitutional Law § 11—**

The police power is inherent in sovereignty and is not dependent upon any constitutional grant.

**3. Same—**

The police power is subject to all constitutional limitations which protect basic property rights, and therefore must be exercised at all times in subordination to Federal and State constitutional limitations and guarantees.

**4. Same—**

The police power extends only to such measures as are reasonably calculated under the existing conditions and surrounding circumstances to accomplish a purpose falling within the legitimate scope of the police power, without burdening unduly, upon the particular facts of the case, the person or corporation affected.

**5. Same—**

The police power cannot be placed within fixed definitive limits, but its extent must be determined upon the facts and circumstances of each particular case by application of the principle that the regulation or

burden imposed must be reasonable in its operation as to the persons whom it affects and must not be unduly oppressive.

**6. Same—**

While the extent of the police power does not expand or contract, what is within the police power at one time may not be within that power at another time, and vice versa, when there is a change of conditions so that a different conclusion is impelled in applying the constant test of reasonableness to the changing factual situation.

**7. Evidence § 5—**

The courts will take judicial notice of the fact that passenger and freight traffic by motor vehicle has greatly increased in recent years, that aid to municipalities in financing the maintenance and construction of streets has been provided, and that the impact of motor vehicular transportation on the business of the rails has undergone a vast change since the expansion of the Federal and State systems of public highways.

**8. Constitutional Law § 15:   Railroads § 3—**

Where no factor of public safety is involved, the police power may not be invoked to require a railroad company to rebuild an overpass over a street in furtherance of the public convenience where neither the location of the railroad nor its use for train operations is a reasonably related causative factor in producing the public inconvenience sought to be remedied.

**9. Same:   Municipal Corporations § 38½ :   Mandamus § 2a— Ordinance requiring railroad company to reconstruct overpass held unconstitutional.**

This action was instituted for *mandamus* to compel a railroad company to reconstruct, at its own expense, its overpass over a municipal street in accordance with a municipal ordinance adopted pursuant to a statute delegating to the municipality the power to require a railroad company to construct and repair overpasses within the city. (Ch. 232, Sec. 54, Private Laws of 1927). The allegations and uncontroverted special facts shown in evidence disclosed that when a street of the city was originally constructed the railroad company, at its own expense, built an overpass for its tracks, that the abutments of the overpass were sufficiently wide to present no danger to the traveling public along the street, but that the city, largely for the purpose of relieving traffic congestion in other parts of the city, proposed to build a new intercity thoroughfare, which would make an X crossing with the old street under the overpass, necessitating a large increase in the span of the overpass. *Held:* The public safety is not involved, and the public convenience to be served was not brought about by any conditions at or along the railroad right of way, and therefore the ordinance as applied to the facts of this case amounts to an unreasonable exercise of the police power and an invasion of the railroad company's property rights in violation of Article I, Section 17, of the Constitution of North Carolina.

PARKER, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Johnston,* Resident Judge of the Twenty-

first Judicial District of the Superior Court, in Chambers at the Courthouse in Winston-Salem, 24 July, 1957. From FORSYTH.

*Joyner & Howison; William T. Joyner, Jr.; Deal, Hutchins & Minor and William C. Bennett, Jr. for defendant, appellant.*

*Ratcliff, Vaughn, Hudson, Ferrell & Carter; Ralph M. Stockton, Jr.; and Robert G. Stockton for plaintiff, appellee.*

JOHNSON, J.  This is a civil action by plaintiff, City of Winston-Salem, for writ of *mandamus* to compel the defendant, Southern Railway Company, to rebuild at its entire expense the overpass trestle where the railroad tracks cross over Northwest Boulevard, in accordance with an ordinance adopted by the City Board of Aldermen on 15 April, 1957.

Northwest Boulevard was established as a city street in 1922. It was laid out to pass under the tracks of the Southern Railway Company at a point where its roadbed was on top of an embankment some twenty feet high. It was thus necessary that an excavation be made through the embankment under the tracks. This required the erection of an overpass trestle to span the opening over the new street. The City requested the railway company to build the trestle, and it did so at its own expense, although the City paid for the excavation work.

The trestle has been in use since 1923. The City is now demanding that the railway company rebuild the trestle in extended length, to accommodate the opening of a new street, known as Broad Street Extension, laid out to intersect and cross Northwest Boulevard under the trestle, so as to make an X crossing under the trestle. The abutments of the present trestle are about 36 feet apart. The present street, 34 feet wide, passes between these abutments. The city ordinance sought to be enforced in this action requires a horizontal clearance of not less than 62.5 feet. To comply with the ordinance would require the complete rebuilding of the trestle at an expense to the railway company of approximately $57,000. Also, it would necessitate the appropriation of considerably more of the railway right of way.

The ordinance requiring the railway company to rebuild the trestle was enacted by the Board of Aldermen of the City in the exercise of power granted the City in its Charter, Ch. 232, Sec. 54, Private Laws of 1927, which provides that the City "shall have the power to require" any "railroad company . . . at its own expense, to construct, maintain and repair . . . crossings at grade, over or under its streets. . . ." By this charter provision the General Assembly delegated to the City a *quantum* of the State's sovereign police power. *Brewer v. Valk*, 204 N.C. 186, 167 S.E. 638; 11 Am. Jur., Constitutional Law, Sections 255 and 256.

The City alleges that dangerous traffic congestion exists "on West Fifth Street, on Broad Street from Fifth Street to West End Boulevard and Seventh Street, on West End Boulevard from Broad Street and Seventh Street to Reynolda Road, on Reynolda Road from West End Boulevard and extending some distance North of its intersection with Northwest Boulevard, on Northwest Boulevard for some distance westwardly from Reynolda Road, on Northwest Boulevard from Chatham Road to Reynolda Road"; that existing conditions "cause(s) serious delay in traffic flow and constitute(s) a hazard to the public safety and welfare of the citizens of Winston-Salem," and that it is necessary for the public safety and public welfare to extend Broad Street northwardly to join with Thurmond Street at Northwest Boulevard as proposed, so as to provide a north-south intercity thoroughfare extending from Corporation Parkway in the southern part of the City to Coliseum Drive in the northern part of the City, a distance of approximately 2.71 miles; that the present railroad trestle over Northwest Boulevard is inadequate to accommodate the increased flow of traffic that will be produced by the proposed extension of Broad Street; that, on the contrary, the present trestle will unreasonably and dangerously impede and obstruct traffic and will constitute a danger to the public, and that it is necessary in the interest of public safety and welfare that the trestle be rebuilt by the railway company in accordance with the demands of the City.

The defendant by answer denied that the plaintiff is entitled to the relief sought. Among other defenses set up by the defendant are these:

1. That the trestle is now completely adequate for the purposes of the railway company, and as it presently exists causes no danger to the public or to the defendant.

2. That there is no public necessity for a new overpass as contemplated by the ordinance. However, if public necessity be found, the need is not caused by any action of the defendant, but is caused solely by the increase in highway traffic and by the growth of the City of Winston-Salem.

3. Compliance with the ordinance will impose upon the defendant heavy, unjustified expense, and will be of no benefit to the defendant; that the benefits, if any, from the proposed project will accrue only to members of the vehicular traveling public, including the chief competitors of the defendant, the trucks and busses; and that the requirements of the ordinance will amount to the taking of the defendant's property without just compensation and without due process of law.

4. That the provision of the Charter of the City of Winston-Salem

quoted in the complaint and relied on by the plaintiff as authorizing its demand upon the railway company is arbitrary, unreasonable, and unconstitutional, in that it would deprive the defendant of its property without due process of law, in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 17, of the North Carolina Constitution.

5. That the provisions of the ordinance likewise are arbitrary, unreasonable, and unconstitutional, in that they would deprive the defendant of its property without due process of law, in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 17, of the North Carolina Constitution.

Voluminous evidence was offered by each side in support of its allegations and contentions.

Upon facts found by the trial court, substantially in accord with the plaintiff's allegations but with no reference being made to the special facts shown in evidence and relied upon by the defendant railway company, the court entered judgment allowing the City's request for *mandamus* and decreeing that the railway company be required "at its sole expense" to reconstruct the trestle over Northwest Boulevard as directed in the ordinance of 15 April, 1957, with direction that work begin within sixty days after the date of the judgment, and that the project be completed within 280 working days thereafter. From the judgment so entered, the defendant railway company appealed.

The railway company takes the position that the charter provision under which the ordinance was enacted does not grant unlimited power to the City, and that the attempt to require the company to bear the expense of rebuilding the trestle under the facts and circumstances of this case is an unreasonable and unconstitutional exercise of the power delegated to the City in the Charter. The defendant predicates its claim of unconstitutionality upon uncontroverted special facts shown in evidence or of which the courts may take judicial notice, which it contends factually distinguish the instant case from the decisions cited by the City, and take the case out of the principles relied upon by the City as authority to sustain the validity of its ordinance.

The railway company's contentions must be viewed in the light of the basic proposition that the police power is a reserve power, and not a grant derived from or under any constitution, which may be exercised for the promotion of the public safety, the general welfare, and the public convenience.

Nevertheless, the railway company is entitled to have its conten-

tions resolved in the light of these equally well-established general principles:

1. That the police power is subject to all the constitutional limitations which protect basic property rights, and therefore must be exercised at all times in subordination to Federal and State constitutional limitations and guarantees. *Clinard v. Winston-Salem*, 217 N.C. 119, 6 S.E. 2d 867; *Brewer v. Valk, supra* (204 N.C. 186); *Clinton v. Oil Co.*, 193 N.C. 432, 137 S.E. 183; *S. v. Whitlock*, 149 N.C. 542, 63 S.E. 123; *S. v. Williams*, 146 N.C. 618, 61 S.E. 61. .

2. That the accepted standard by which the validity of all exercise of the police power is tested is that the power extends only to such measures as are reasonable under all existing conditions and surrounding circumstances. 11 Am. Jur., Constitutional Law, Sec. 302. See also *Austin v. Shaw*, 235 N.C. 722, 71 S.E. 2d 25; *Shuford v. Waynesville*, 214 N.C. 135, 198 S.E. 585; *Barger v. Smith*, 156 N.C. 323, 72 S.E. 376.

3. Therefore, when the exercise of the police power is challenged on constitutional grounds, the validity of the police regulation primarily depends on whether under all the surrounding circumstances and particular facts of the case the regulation is reasonable; that is, whether it is reasonably calculated to accomplish a purpose falling within the legitimate scope of the police power, without burdening unduly the person or corporation affected. 11 Am. Jur., Constitutional Law, Sec 302. See also *Cab Co. v. Shaw*, 232 N.C. 138, 59 S.E. 2d 573; *Turner v. New Bern*, 187 N.C. 541, 122 S.E. 469; *S. v. Bass*, 171 N.C. 780, 87 S.E. 972. In short, it must appear that the regulation or burden imposed is reasonable in its operation as to the persons whom it affects, and it must not be unduly oppressive. *East Side Levee & Sanitary Dist. v. East St. Louis & C. Ry.*, 279 Ill. 123, 116 N.E. 720; 11 Am. Jur., Constitutional Law, Sec. 302. What constitutes an unreasonable interference with or burden upon private property in the exercise of the police power is a matter for which there is no fixed formula or all-embracing test. It is a matter resting in human judgment, ordinarily to be determined on principles of natural justice in the light of all the relevant facts, circumstances, and conditions in each particular case. See *Bonnett v. Vallier, et al.*, 136 Wis. 193, 116 N.W. 885; 11 Am. Jur., Constitutional Law, Sec. 304. Necessarily, then, a police regulation valid in its application to one set of facts may be invalid as to another. *Nashville C. & St. L. R. Co. v. Walters*, 294 U.S. 405, 79 L. ed. 949.

4. Since the police power of the State has not been, and by its nature cannot be, placed within fixed definitive limits, it may be extended or restricted to meet changing conditions, economic as well as

social. Accordingly, a matter under specific regulation or burden imposed by exercise of the police power at a previous time does not necessarily operate as a fixed testing device for the exercise of the police power at a later date. *Miller v. Board of Public Works,* 195 Cal. 477, 234 P. 381; *Hall v. Johnson,* 87 Ore. 21, 169 P. 515. Therefore, what was at one time regarded as an improper exercise of the police power may now, because of changed conditions, be recognized as a legitimate exercise of that power. *Elizabeth City v. Aydlett,* 201 N.C. 602, 161 S.E. 78; *Miller v. Board of Public Works, supra;* 11 Am. Jur., Constitutional Law, Sec. 253. Similarly, a police regulation or measure, although valid when promulgated, may become unreasonable and confiscatory in operation as a result of later events or changed conditions. *Nashville C. & St. L. R. Co. v. Walters, supra.* As to this, the logic of the thing is, not that there is any expansion or any retraction of the basic principles underlying the police power, but rather that the changed conditions as they arise bring the subject matter in question within the operation of approved testing principles of reasonableness or remove it therefrom. See *Chastleton Corp. v. Sinclair,* 264 U.S. 543, 68 L. ed. 841; *Abie State Bank v. Bryan,* 282 U.S. 765, 75 L. ed. 690; *Taylor v. Baltimore & O. R. Co.,* 138 W. Va. 313, 75 S.E. 2d 858; *Hubbell Bank v. Bryan,* 124 Neb. 51, 245 N.W. 20; *Realty Revenue Corp. v. Wilson,* 181 N.Y. Misc. 802, 44 N.Y.S. 2d 234; *Vigeant v. Postal Telegraph Cable Co.,* 260 Mass. 335, 157 N.E. 651; *Fort Worth & D. C. Ry. Co. v. Welch,* 147 Tex. Civ. App. 634, 183 S.W. 2d 730; *Atlantic Coast Line R. Co. v. Ivey,* 148 Fla. 680, 5 So. 2d 244.

In *Abie State Bank v. Bryan, supra,* it is stated that "a police regulation, although valid when made, may become, by reason of later events, arbitrary and confiscatory in operation . . ." In *Realty Revenue Corp. v. Wilson, supra,* it is said: "Contrary to what perhaps may be a popular impression, the constitutionality of laws depends, not upon abstract theories of philosophy, but upon a very practical application of laws to facts, and a statute which is valid as to one set of facts may be invalid as to another, and one which is valid when enacted may become invalid by change in the conditions to which it is applied . . ." In *Vigeant v. Postal Telegraph Cable Co., supra,* it is said: "A change in economic conditions may render void a statute valid at its enactment . . ." In *Atlantic Coast Line R. Co. v. Ivey, supra,* it is stated: "It is well settled that a statute valid when enacted may become invalid by change in conditions to which it is applied. . . ."

The decisions cited by the City of Winston-Salem uphold State statutes and municipal ordinances which imposed upon railroads the

whole or a part of the expense of (1) improving, altering, and rebuilding crossings at grade; (2) eliminating grade crossings by means of underpasses or overhead bridges; and (3) altering and rebuilding existing underground and overhead crossing facilities.

A study and analysis of the decisions relied on by the City disclose that in most of the cases the factors justifying the financial burdens imposed on the railroads in making the crossing improvements were considerations of public safety and public convenience—the protection of the traveling public from the dangers of grade crossing accidents and the inconveniences caused by traffic interruptions at heavily traveled crossings—with greater emphasis being placed on the factor of public safety.

In *Durham v. R. R.* (1923), 185 N.C. 240, 117 S.E. 17, the City of Durham applied for a writ of *mandamus* to compel three railroad companies (Southern Railway Co., Norfolk & Western Railway Co., and Seaboard Air Line Railroad Co.) to eliminate an existing grade crossing on Chapel Hill Street in the industrial section of the City, by building a street underpass under the tracks of the three railroads. The lower court entered judgment allowing the writ and requiring the railroad companies to eliminate the grade crossing. On appeal to this Court the judgment below was affirmed. Decision turned primarily on considerations of public safety, with the factor of public convenience being treated as a subordinate matter: Chapel Hill Street is one of the main streets for traffic in the City of Durham, connecting the northern and southern portions of the City. At that time it was the main thoroughfare leading from Durham to Chapel Hill. The three defendant railroads had tracks crossing the street at grade, over which were operated both freight and passenger trains. Within a radius of approximately 800 yards of the grade crossing were located the freight depots of all three defendants, large tobacco plants and factories, ice and power plants, flour mills, and hosiery mills, all of which depots and industries were served with spur tracks over which were operated frequently, day and night, passenger trains, freight trains, and switching engines. The record of a traffic count, unchallenged by the railroads, showed the following volume of traffic passing over the grade crossing daily: An average of about 4,000 pedestrians and bicycles, over 500 horse-drawn vehicles, more than 2,000 passenger automobiles, more than 350 delivery wagons, over 100 heavy trucks, and over 200 street cars. It was alleged in the complaint and admitted in the answer that several accidents had occurred at the grade crossing in which people, animals, and vehicles had been injured, *and that the crossing was dangerous to the traveling public.* The City also alleged that street traffic was seriously interrupted and

impeded by numerous trains and switching engines blocking the cross-
ing, both day and night. In speaking to the factor of public safety,
the Court said (bot. p. 243): ". . . It is traversed by thousands of people
daily, and the question whether or not the *public safety* demanded
elimination of the grade crossing was one in the legislative power of
the governing authorities of the city of Durham, and their decision
is conclusive and final, unless it was shown that it is clearly oppres-
sive or amounts to abuse of their discretion." (Italics added.) The
Court said further (bot. p. 248): "The State, in the exercise of the
police power, may authorize a city to require a railroad company to
construct at its own expense such viaducts over its tracks at street
crossings as may be necessary *for the safety and protection of the
public.*" (Italics added.) In the case at hand, the City's proposed
project which requires lengthening and rebuilding the overhead trestle
is not a grade separation project, nor, as hereinafter explained, *is it
one made necessary by considerations of public safety.* Moreover, it
is significant that in the *Durham* case the railroads made no attempt
to show that the ordinance requiring them to eliminate the grade cross-
ing at their expense was unreasonable. In fact, the railroads offered
no evidence at the hearing in Superior Court. Therefore, the *prima
facie* presumption in favor of the validity of the city ordinance pre-
vailed, entitling the City of Durham to the writ of *mandamus* to en-
force the ordinance, and this Court so held. In the instant case, the
record discloses voluminous evidence tending to show that the chal-
lenged ordinance is unreasonable and oppressive under all the facts
and circumstances of the case.

In *R. R. v. Goldsboro* (1911), 155 N.C. 356, 71 S.E. 514, the rail-
road occupied with its tracks the chief street of the City of Goldsboro.
The right of way, 65 feet on each side of the roadbed, embraced the
whole of what is known as East and West Center Streets, which ex-
tend north and south the entire length of the City. The right of way
was acquired originally about 1835, and the town built up on both
sides, with the buildings facing the tracks. The City under charter
authority instituted a system of grading its streets. In pursuance of
this work the roadbed of the railroad on Center Street was left from
6 to 18 inches higher than the grade of the streets on each side of
the tracks and of the streets which crossed East and West Center
Streets at right angles. This condition seriously interrupted and men-
aced the safety of traffic crossing the tracks from one side of Center
Street to the other. The City passed an ordinance requiring the rail-
road to lower its roadbed so as to make it level with the city streets
on each side. The plaintiff railroad instituted an action to enjoin the
enforcement of the ordinance, alleging it to be unconstitutional. The

lower court denied plaintiff's application for injunction, and plaintiff appealed. This Court treated the constitutional question as properly raised, resolved the question in favor of the City, and affirmed the judgment of the lower court. The decision upholding the validity of the ordinance was rested on interpretation of a provision of the Charter of the railroad granted by act of the General Assembly of 1833, which provided that whenever the tracks of the railroad company intersected and crossed "any public or private road" established by law, the railroad should "be so constructed as not to impede the passage of travelers" on such road. The Court construed this provision as applying not only to roads and streets laid out and existing when the railroad was built, but also to new roads and streets thereafter opened (Cf. *S. v. Wilmington & Weldon R. R. Co.*, 74 N.C. 143), and held that the ordinance requiring the railroad company to lower its tracks from 6 to 18 inches at the points where the cross streets passed over the railroad tracks was a lawful exercise of police power conferred on the City in its Charter. It thus appears that in the *Goldsboro* case the basic, controlling facts were entirely different from those in the instant case. In that case, in addition to the crucial provision in the railroad company's Charter, there was a direct relation between the necessity for lowering the tracks and the promotion of both the public safety and the public convenience. In the instant case, the element of public safety usually involved in railroad crossing cases is entirely missing; and the need for promoting the public convenience derives from the necessity for relieving traffic congestion, principally in other areas of the City, not caused in any manner by the location of the railroad tracks.

In *Shreveport v. Kansas City S. G. R. Co.* (1929), 167 La. 771, 120 So. 290, 62 A. L. R. 1512, suit was instituted to compel the railroad company to remove piers supporting an overhead bridge from the paved portion of the street. It there appeared that the piers rendered the street unsafe for travel, and the factor of public safety was the controlling consideration in upholding the lower court in requiring the railroad company to remove the piers.

In *Windsor v. Delaware & Hudson Canal Co.* (1895), 36 N.Y.S. 863, affirmed 155 N.Y. 645, 49 N.E. 1105, abutments on the highway supporting an overhead bridge for twenty years were required to be set back to a point where they would not be a traffic menace or impair the usefulness of the highway. The abutments were only 13 feet 2 inches apart. Manifestly, the factor of public safety was the controlling consideration in the decision.

In *Chicago, Milwaukee & St. Paul Ry. Co. v. City of Minneapolis* (1914), 232 U.S. 430, 58 L. ed. 671, the railroad company was re-

quired to construct a bridge to carry its tracks across a canal dug by the City to connect two lakes, used by the public for boating and recreation. Here the controlling factor was that of public convenience. The opening of the canal through the railroad right of way for the accommodation of those traveling by small boats was treated on the same footing as if the opening had been for a new street.

In *Missouri Pac. Ry. Co. v. City of Omaha* (1914), 235 U.S. 121, 59 L. ed. 157, the railroad company was required to build a viaduct over its tracks at a street crossing at a cost of $80,000, to support street railway traffic as well as ordinary street traffic; whereas the cost of a bridge adequate for ordinary traffic would have been only $30,000. Decision of the lower court requiring the company to pay all the costs was upheld upon considerations of public safety, though it is stated in the opinion that "it may be that it would be more fair and equitable to require the street railway company to share in the expense of the viaduct . . . but there is nothing in the statute requiring the municipality to divide the expense of such improvement. . . ."

In *Erie R. R. v. Board of Utility Commissioners* (1921) 254 U.S. 394, 65 L. ed. 322, the railroad company was required to separate 15 grade crossings in the City of Patterson, N. J., by carrying 14 of the crossings under and one over the railroad, at a cost of $2,000,000. The street railway company using three of the crossings was required to pay 10% of the costs of changing these three crossings. Considerations of public safety appear to have been the controlling factor in justifying the imposition upon the railroad company of the principal costs of these improvements, notwithstanding few accidents were shown to have occurred at the crossings. The Court dealt at some length with the element of potential dangers. We quote from the opinion: "If we could see that the evidence plainly did not warrant a finding that the particular crossings were dangerous, there might be room for the argument that the order was so unreasonable as to be void. The number of accidents shown was small, and if we went upon that alone, we well might hesitate. *But the situation is one that always is dangerous.* The board must be supposed to have known the locality, and to have had an advantage similar to that of a judge who sees and hears the witnesses. The courts of the state have confirmed its judgment. *The tribunals were not bound to await a collision that might cost the road a sum comparable to the cost of the change.*" (Italics added.)

In *Atchison, Topeka & Santa Fe Ry. Co. v. Public Utilities Commission of California* (1953), 346 U.S. 346, 98 L. ed. 51, there were two cases consolidated for hearing. In the first case, the State Public Utilities Commission required the enlargement of two existing rail-

road underpasses. These underpasses were constructed in 1914. When first constructed, their chief utility was to facilitate access to a garbage reduction plant. The street on which they are located is now one of the main thoroughfares of the City of Los Angeles, and the grade separations are in one of the principal industrial districts of the City. The street at the approaches to each underpass is 60 feet wide but narrows to 20 feet, with vertical clearance of less than 14 feet, at the underpass. The underpasses thus present traffic bottlenecks. The improvement project as required by the Commission calls for the enlargement of each to a width of 33 feet. "The Commission found that $569,355 of the costs was attributable to the presence of the railroad tracks and that the railroad should pay 50% of this amount and the city 50%." In the second case, the Commission's order required that a grade crossing be replaced by an underpass where considerable congestion was occurring when the crossing was blocked by trains. It was made to appear that when the crossing was blocked by trains, "38 or more vehicles may back up in each of three lanes, causing a 'backlash' on San Fernando Road, 820 feet distant." Minor accidents had occurred at the crossing. The total costs of the project were estimated at $1,493,200. The Commission ordered that 50% be borne by the railroad, 25% by Los Angeles County, and 12½% each by the cities of Los Angeles and Glendale. On appeal, the railroad company resisted the apportionment of any part of the costs of the projects, mainly upon the ground that it would derive no benefits from the improvements. The benefit theory was dismissed summarily by the Court, and it was held that since it was the presence of the railroad's tracks in the streets that created the necessity of constructing grade separations in the interest of the public safety and public convenience, the railroad company was not in position to complain because it would receive no special benefits from the improvements.

In *Burough of Sayreville v. Pennsylvania R. R. Co.* (1957), 44 N. J. *Super.* 172, 129 A. 2d 895, the railroad company was required to bear the expense of rebuilding a bridge where a city street crossed over the tracks, the old bridge being too narrow for large commercial vehicles, such as busses and trucks with substantial overhang, to pass one another on the bridge. It is manifest that the controlling considerations justifying imposition upon the railroad of the costs were factors of both public safety and public convenience.

In *Carolina & N. W. Ry. Co. v. Town of Lincolnton* (1929), 33 F. 2d 719, the railroad company was required, chiefly upon considerations of public safety, to replace a wooden bridge over the railroad tracks with a steel one, the old bridge being located within the town fire district.

The basic pattern of the foregoing decisions relied on by the City is that where impelling considerations of safety or convenience of the traveling public require alterations or improvements at a grade crossing, or that the grade crossing be eliminated entirely by carrying the tracks over a public way or the public way over the tracks by bridge, the duty of making the required alterations or improvements, or of providing the necessary bridge, ordinarily devolves upon the railroad company. The basis of this rule is the superior nature of the public's right to the safe and unimpeded use of streets and highways. *Erie R. R. v. Board of Utility Commissioners, supra* (254 U.S. 394, 65 L. ed. 322). The thread of decision seems to be that if the operation of the railroad, either at grade level or upon a particular type of elevated overhead support for its tracks, interferes materially with the public safety or with the public convenience in the exercise of the superior right of the public to use the public way, then the railroad company, being regarded in law as the agency causing the dangers or inconveniences, is charged with a legal duty to remedy the situation and may be required to make alterations and changes of its crossing facilities. *R. R. v. Minneapolis,* 115 Minn. 460, 133 N.W. 169, Ann. Cas. 1912D, 1029; *Erie R. R. v. Board of Utilitiy Commissioners, supra.* However, the legal duty imposed by law on railroad companies and enforced by exercise of the police power in most of these crossing cases relates to the elimination of dangers and inconveniences to the traveling public which may be said to be of the company's own making in the sense that the railroad is located so as to interfere with the superior right of the traveling public to the use of the public way. And, where the police power is invoked to require a railroad company to pay for a crossing improvement in furtherance of public safety, the exercise of the power usually relates to measures designed to eliminate specific dangers at the crossing, to prevent or minimize crossing accidents. Similarly, where the police power is invoked to promote the public convenience, the exercise of the power usually relates to measures providing for the removal of conditions which unduly interrupt and impede the free movement of traffic at the crossing.

In the instant case the need for rebuilding the trestle is not brought about by any existing dangerous condition at the crossing, nor by any conditions which unduly interrupt and impede the free movement of traffic at the crossing. This is not a grade separation case. There is not now and never has been a crossing at grade at the place where Northwest Boulevard and the tracks of the railroad intersect. As previously noted, Northwest Boulevard was opened in 1923. At that time the tracks of the railroad ran along its right of way atop an embankment about 20 feet high. The street was opened by exca-

vating through the embankment, thus necessitating the erection of the present railway trestle to span the opening over the street. There has never been and cannot now be any danger to the traveling public because of the existence of the tracks along the trestle over the present street. The trestle has never been and is not now an obstruction to vehicular traffic on Northwest Boulevard. As to this, the evidence nowhere discloses any element of danger. The record discloses no evidence of any accident at the trestle or anywhere in its vicinity. True, the City's evidence discloses that the present underpass is not wide enough to accommodate the full width of the proposed new street which is to intersect and cross the present street under the trestle at an oblique angle so as to make the proposed X crossing under the trestle. Therefore, unless the opening under the present trestle is widened, the new street will have to be reduced in width at the approaches to the present abutments. This would create on the new street a bottleneck at the approaches to the underpass and make for a hazardous situation for motorists approaching the underpass on the new street. But this situation of possible danger would be entirely of the City's making in its attempt to eliminate traffic congestion, originating principally in other areas of the City, by establishing a north-south intercity thoroughfare to accommodate traffic to be diverted and rerouted into it from outlying areas. Thus, in the case at hand the need for rebuilding the trestle is to promote the public convenience by providing a new street, and the need for opening the new street is to provide a necessary link in the proposed intercity thoroughfare, designed to relieve traffic congestion brought about by reason of the increase in motor vehicular traffic, and not by any conditions at or along the railroad right of way tending to interrupt or impede the free movement of traffic at the crossing. Hence the need for the new trestle is not brought about by the location of the railway roadbed or by the operation of trains thereon.

We do not apprehend the better reasoned decisions relied on by the City to stand for the proposition that where, as here, no factor of public safety is involved, the police power may be invoked to require a railroad company to rebuild a crossing facility in furtherance of the public convenience, where neither the location of the railroad nor its use for train operations is a reasonably related causative factor in producing the public inconvenience sought to be remedied, and where the project required of the railroad company is part of a program of extensive street improvements, designed to relieve traffic congestion in nowise caused by the location of the railroad. See *Nashville C. & St. L. R. Co. v. Walters, supra* (294 U.S. 405, 79 L. ed. 949) and cases there cited.

While numerous decisions hold that a railroad company may not

be relieved of the expense of making crossing improvements because it will derive no benefit from the improvement, nevertheless, in most of the cases cited by the City it is manifest that the company stood to benefit substantially from the overpass, underpass, or other improvement required to be constructed. The benefits accruing to the railroads came in the form of minimized crossing accidents and reduced tort liability of the companies. The improvements also facilitated faster movement of trains and shifting operations in congested areas. See *Durham v. R. R., supra* (185 N.C. 240); *Erie R. R. v. Board of Utilities Commissioners, supra* (254 U.S. 394, 65 L. ed. 322).

True, in some of the cases there was no direct benefit to the railroad from the crossing improvements, as in Cincinnati, *I. & W. R. Co. v. Connersville* (1910), 218 U.S. 336, 343, 344, 54 L. ed. 1060, 1064, 1065, 31 S. Ct. Rep. 93, where the railroad was required to build a trestle to accommodate the opening of a new street through its roadbed embankment. However, in this and other like cases decided or based on precedents established during the earlier days of railroading, before the development of our present State and Federal systems of improved highways, when vehicular traffic operated within short distance limits and served as important feeders for the railroad companies, the railroads shared substantially with the general public in the benefits of improved crossing facilities, in that the improved facilities tended to speed up the movement of vehicular traffic as feeders for the rails. Moreover, since practically all common carrier freight and passenger traffic moved by rail, the costs of these crossing improvements, under sanction of the regulatory agencies, were built into the rate structures and were passed on, first to the shipping public, and then to the ultimate consumers of the products moving by rail. And since these built-in costs were susceptible of being passed on to the ultimate consumers so effectively, the imposition upon the railroad companies of the financial burdens of making crossing improvements comported entirely with basic principles of fairness, and were conceived to impose no undue burdens upon the railroad companies.

But conditions have changed. The benefits and conveniences derived by the vehicular traveling public from improved crossing facilities are no longer shared to any appreciable extent by the railroads. The horse-drawn vehicles which in the early days of railroading served as great feeders and suppliers of business for the railroads have vanished from the scene. And, the impact of motor vehicular transportation on the business of the rails has undergone a vast change since the expansion in recent years of our State and Federal systems of public highways and the concurrent development of the processes of mass production of improved motor vehicles. These vehicles — passenger automobiles, long and short-haul busses, and large van type

motor trucks — are part of the country's fabulous motor transportation system which, operating both as private and public carriers of passengers and freight on our nationwide improved system of public highways, in recent years has taken from the railroads large volumes of their former business. These motor vehicles are now real competitors of the rails. No longer do they serve to any appreciable extent as feeders for the rails. They take their commodities and passengers to final destination. They are handling a large percentage of both short and long-haul freight that otherwise would move by rail.

Under the ordinary competitive conditions now prevailing between the rails and motor transport where, as here, the railroad company derives no direct benefit from the proposed crossing improvement, the imposition on the company of the costs of the project may not ordinarily be justified to any degree on the theory that the costs will be absorbed in the rate structure and passed on to the general public. This is so because rail rates, like other competitive price structures, are subject now in a real sense to the economic law of diminishing returns. And by reason of prevailing conditions under which the rails are in a losing competitive fight for business with other modes of transportation, the costs of crossing improvements may not be built into the rate structures and passed on effectively to the shipping public as in former times. Besides, and assuming *arguendo* that the costs of these improvements might still in some instances be absorbed in railroad rate structures and passed on to the ultimate consumers, even so, there would be an element of basic unfairness in such process where, as here, the company stands to receive no direct benefit from the project, since the costs would fall only on consumers of goods and on passengers moving by rail, in exoneration of the vast volume of commodities and passengers moving by motor and other competitive modes of transportation.

The competitive position of the defendant Southern Railway Company has not escaped the general impact of the rise and development of motor vehicular transportation. Since 1923, when the present trestle was built, the railway has lost the greater part of its passenger traffic to competitive modes of travel, principally to private automobiles and public busses. During the period mentioned, while the volume of freight of this particular railway company has not decreased, it has not kept pace with the tremendous industrial and commercial development of the areas of the South in which it operates. Obviously, this lag is due mainly to the great volumes of traffic moving by competitive motor transport in, out, and through the areas served by the defendant railway.

Thus, the situation here presented is one in which the railway company is being called upon to pay for a street improvement project

which will be of no benefit, direct or indirect, to it; whereas all the benefits will flow to its competitors, the owners and operators of all types of motor vehicles.

There are other changed conditions which bear upon the reasonableness of the proposition here presented:

1. Since 1928 there has been an increase in the number of registered motor vehicles in Forsyth County from 16,895 to 72,420. The population of the City of Winston-Salem in 1920 was 48,395. The present population of the City is approximately 110,000 persons.

2. In the year 1928 the amount of ad valorem taxes on automobiles and trucks collected by the City of Winston-Salem was $48,350.65. That amount has increased until in 1955 it was $230,661.03, and in 1956, $240,376.91.

3. In the year 1956 the City of Winston-Salem received as its portion of gasoline taxes imposed by the State of North Carolina and allotted to the City under the provisions of the statute commonly known as the Powell Act (Ch. 260, S. L. 1951, now codified as G.S. 136-41.2 and 136-41.3), the sum of over $300,000 for the construction and maintenance of public streets in the City of Winston-Salem other than State highways. Since 1956, the City has received comparable amounts of revenue from the same sources.

The more than one-half million dollars derived yearly by the City of Winston-Salem from these ad valorem and gasoline tax sources furnishes a lucrative source of revenue, logically subject to earmark for street improvement projects like this one, that was not available when the trestle was built in 1923. It is also noteworthy that these sources of revenue were not available to the cities and towns of the State when the decisions of this Court were rendered in *R. R. v. Goldsboro, supra* (1911), and in *Durham v. R. R., supra* (1923), wherein the Court recognized in dealing with the fact situations there presented the principle of requiring railroad companies to pay all the costs of crossing projects.

In *Austin v. Shaw* (1952) *supra*, (235 N.C. 722), the Court, in dealing with principles evolved from the early grade elimination cases, recognizes the need for flexible application of these principles to meet the exigencies of changed conditions. In the *Austin* case the question for decision was the validity of a contract between the City of Charlotte and the Southern Railway Company which provided a comprehensive plan for the elimination of a large number of grade crossings within the City and other incidental alterations and improvements, at an overall cost of five million dollars, one-half of which was to be contributed by the Federal Government, with the City and the railway company furnishing the other half in equal parts. The City's contribution of $1,250,000 was made available by bond issue approved

by the qualified voters of the City. The contract was challenged in a taxpayer's suit on the ground that the proposed contribution of the City toward the completion of the planned improvements would constitute an illegal expenditure of public funds of the City, for that the City had full power and authority to require the railway company to eliminate the grade crossings in the City at its own expense. The contract was upheld in the lower court. On appeal, this Court concluded, in an opinion written by Chief Justice Devin, that the principles applied in the cases cited by the plaintiff taxpayer (which included the cases chiefly relied on by the City of Winston-Salem in the instant case) were not so inflexible as to render invalid the action of the City of Charlotte in joining with the railway company in the proposed cooperative plan to separate grade crossings and make other improvements according to the terms of the contract. The judgment of the lower court upholding the contract was affirmed.

As bearing further on the factor of changed conditions, we take note of a growing legislative trend throughout the country to relieve the railroads of some or all of the costs of making crossing improvements. For example, see these decisions involving crossing improvements where the enabling legislation under challenge in each instance provided that a substantial portion of the costs be paid by the State agency or municipality requiring the improvement to be made: *Chicago, Burlington, and Quincey Railroad Co. v. Nebraska* (1898), 170 U.S. 57 42 L. ed. 948, 18 S. Ct. 513; *Chicago, Milwaukee & St. Paul Ry. Co. v. City of Minneapolis* (1914) *supra* (232 U.S. 430, 58 L. ed. 671;) *In re Elimination of Grade Crossing* (1931), 124 Ohio St. 406, 179 N.E. 139; *Nashville, Chattanooga & St. Louis Ry. Co. v. Walters* (1935), *supra* (294 U.S. 405, 79 L. ed. 949); *In re Elimination of Existing Highway-Railroad Crossing* (1938), 254 App. Div. 412, 5 N.Y.S. 2d 946; *Lyford v. New York* (1944), 140 F. 2d 840; *Chicago Junction Ry. Co. v. Illinois Commerce Comm.*, (1952), 412 Ill., 579, 107 N.E. 2d 758; *Atchison, Topeka & Santa Fe Ry. Co. v. Public Utilities Commission* (1953), *supra* (346 U.S. 346, 98 L. ed. 51); *Department of Highways v. Pennsylvania Public Utility Comm.* (1955), 179 P. Super. 376, 116 A. 2d 855.

It is noteworthy that in *Durham v. R. R., supra* (185 N.C. 240), wherein this Court upheld the lower court in requiring the defendant railways to pay all the costs of a grade separation in downtown Durham, while the case was pending on appeal in this Court the General Assembly ratified Chapter 160, Public Laws of 1923, which provided in section 19 that on grade separation projects on State highways the State Highway and Public Works Commission should pay one-half the costs of the project and the railroads the other half. This statute

as presently codified, G.S. 136-20 (b), retains the fifty-fifty allocation provision.

Also, under the Federal Aid Highway Act of 1944, 58 U.S. Statute at Large, 841, Ch. 626, Sec. 5 (b), railroads are required to pay for underpasses and overpasses where Federal money goes into the projects only in proportion to the benefits received, and in no case in excess of ten per cent. In view of the difficulty of determining benefits in each particular case, the Federal Bureau of Roads promulgated a regulation, defendant's Exhibit 21, which fixed the railroad's liability at ten per cent in all cases where an existing grade crossing is eliminated by the construction of an overpass or underpass, and relieving the railroad from all liability where an existing grade crossing is not eliminated. Manifestly this was done on the theory that where an existing grade crossing is eliminated, the railroad gets ten per cent of the benefit from such elimination and the vehicular traveling public ninety per cent, and where no existing grade crossing is eliminated but a new road or street opened, the railroad gets no benefit and the traveling public gets all the benefit. Therefore, if Federal money were being used in the Broad Street Extension project, the railway company would be required to pay nothing, since a new street is being opened and no grade crossing is being eliminated. As it is, the project is on neither the State nor the Federal system of highways. Hence, decision rests solely on the validity of the challenged city charter provision, as applied to this case.

The uncontroverted special facts shown in evidence or of which the courts may take judicial notice, as herein pointed out, disclose changed economic conditions bearing favorably on the financial condition of the City but unfavorably on that of the railway company, and factually distinguish the instant case from the decisions cited by the City and take the case out of the principles relied upon by it as authority to sustain the validity of its ordinance.

Upon consideration of these special facts and all the surrounding circumstances of the case, we conclude that the ordinance of the City of Winston-Salem requiring the defendant railway company to pay the entire expense of rebuilding the trestle amounts to an unreasonable exercise of the police power, amounting to an invasion of the company's property rights in violation of the constitutional guarantee provided by the "law of the land" or "due process" section of the Constitution of North Carolina. Article I, Section 17. See *Transportation Co. v. Currie, Comr. of Revenue,* 248 N.C. 560 (4th headnote), 104 S.E. 2d 403. See also *S. v. Ballance,* 229 N.C. 764, 51 S.E. 2d 731, 7 A.L.R. 2d 407.

It necessarily follows that the section of the Charter of the City

of Winston-Salem (Section 54, Ch. 232, Private Laws of 1927) under which the ordinance here sought to be enforced was enacted, is unconstitutional and void, as applied to the facts of this case. The judgment allowing the City's request for *mandamus* is vacated, and the cause will be remanded to the court below for the entry of judgment in accord with this opinion.

Error and Remanded.

PARKER, J., took no part in the consideration or decision of this case.