SOUTHERN RAILWAY COMPANY v. CITY OF WINSTON-SALEM

No. 32

(Filed 11 July 1969)

**1. Constitutional Law § 11— police power of the State**

The General Assembly, exercising the police power of the State, may legislate for the protection of the public health, safety, morals and general welfare of the people, and has conferred such legislative authority upon the Board of Aldermen of Winston-Salem. G.S. 160-52; G.S. 160-200(6), (7) and (10); Ch. 232, Private Laws of 1927.

**2. Railroads § 2— grade crossing — danger to the public — warning devices**

Where trains cross a highway or street at grade, the crossing is hazardous and a danger to persons and property, such danger being lessened, but not eliminated, by the installation and maintenance of automatic signal devices.

**3. Railroads § 2— grade crossing warning devices — benefits to railway company**

Automatic signalling devices at grade crossings benefit the railway company (1) by reducing the risk of liability for personal injury and property damage claims growing out of collisions at the crossings, and (2) by reducing the risk of damage to its own equipment.

**4. Municipal Corporations § 35; Railroads § 2— ordinance requiring grade crossing warning device — validity**

Board of Aldermen of Winston-Salem had authority to provide that automatic signal devices be constructed and maintained at grade crossings of railway's tracks with city streets.

**5. Highways and Cartways § 4; Municipal Corporations §§ 33, 35— city streets — State highway system — sufficiency of evidence**

In this action to determine the validity of a municipal ordinance requiring a railway to install automatic signal devices at two grade crossings and allocating the costs of the signals between the municipality and the railway, findings by the trial court that the streets in question are not links in or parts of the State-maintained system of roads, that no State Highway funds have been used in the construction or maintenance thereof, and that the State Highway Department has never exerted or attempted to exert any control over such streets or either of the grade crossings *are held* supported by competent evidence.

**6. Constitutional Law §§ 13, 23; Municipal Corporations § 35; Railroads § 2— allocation of costs of grade crossing warning devices**

A municipality has authority, in the exercise of its police power to promote public safety and convenience, to allocate to the railway company some portion of the costs of the installation and maintenance of automatic signal devices at grade crossings of its tracks with city streets, such allocation constituting a denial of the railway company's constitutional right to substantive due process only if the proportion of the costs allocated to

it is so unreasonable as to constitute an arbitrary taking of the railway company's property.

**7. Constitutional Law §§ 13, 23;   Municipal Corporations § 35;   Railroads § 2— municipal ordinance allocating costs of grade crossing warning device — constitutionality**

Railway company's constitutional right to substantive due process was not violated by a municipal ordinance requiring the railway company to pay 63% of the cost of installing automatic signal devices at two grade crossings of its tracks with city streets and all of the annual cost of maintenance thereof, such allocation of costs being reasonable under the existing facts and circumstances.

**8. Highways and Cartways § 4;   Railroads § 2— cost allocation for grade crossing improvements — G.S. 136-20 and G.S. 62-237**

The cost allocation formula for grade crossing safety devices and the limitation on the percentage of such costs to be borne by the railway company prescribed in G.S. 136-20 does not apply where the streets involved, at the location of the crossings, are not links in or parts of the State Highway System, and the cost allocation formula and limitation prescribed in G.S. 62-237 do not apply where the raising or lowering of tracks or roadway at a grade crossing in a road or street not forming a link in or part of the State Highway System is not involved.

**9. Municipal Corporations §§ 33, 35;   Railroads § 2— allocation of costs of grade crossing improvements — State policy — municipalities**

G.S. 136-20 and G.S. 62-237 do not establish a State policy with respect to the allocation of costs of grade crossing safety devices and other grade crossing improvements which is binding upon the governing body of a municipality in administering city streets.

Appeal by plaintiff under G.S. 7A-30(1) from the Court of Appeals.

Civil action in which plaintiff (Railway Company) seeks a judgment declaring unconstitutional and void, as applied to the factual situations here involved, two ordinances of defendant (City), and an injunction against the enforcement thereof.

The ordinances, adopted March 20, 1967, relate to widely separated grade crossings, *viz.:* (1) The crossing in the northern sector of City where Railway Company's single track crosses 27th Street; and (2) the crossing in the western sector of City where Railway Company's single track crosses Bethesda Road. They require that Railway Company *shall maintain* automatic signal devices at the street approaches to these crossings. Each provides for the payment by City of *one-half of the cost of constructing* the required automatic signal devices "up to a maximum of $5,000.00."

Plaintiff alleged the provisions of these ordinances are unreasonable and arbitrary; that enforcement thereof would constitute an

unlawful taking of plaintiff's property without due process of law; that Section 54 of the Charter of Winston-Salem (Chapter 232, Private Laws of 1927), as applied to the factual situations here involved, is unconstitutional and void; and that, apart from constitutional considerations, the proportion of costs allocated to Railway Company exceeds the maximum permissible under designated General Statutes declaratory of State policy, including G.S. 136-20.

In its answer, in addition to a general denial of plaintiff's crucial allegations, City alleged that each of the crossings, under existing conditions, constitutes "a hazard to persons and property" on account of "the lack of any signaling devices warning of approaching trains"; that the safety of the public required "that proper signaling devices be installed at both crossings"; and that the challenged ordinances were enacted by its Board of Aldermen in the exercise of City's authority "to enact such ordinances as are necessary to protect and safeguard the health, safety and general welfare of the public." City's answer contains no reference to Section 54 or any other portion of City's Charter.

It was stipulated "that the Court might hear the evidence without a jury, make determinations of fact if any issues of fact arose during the trial, reach conclusions of law and enter a judgment. . . ." The judgment recites that, "upon the evidence presented," the court found the facts set forth in paragraphs numbered 1 through 42. The court, as a basis for Findings of Fact Nos. 1 through 37, adopted, with immaterial variations, the facts which were stipulated (for the purposes of this case) by the parties. The paragraphs designated Findings of Fact Nos. 38 through 42 include legal conclusions as well as factual findings based on evidence.

Reference is made to the statement of facts by Parker, J., in his opinion for the Court of Appeals, for a full and accurate summary of the stipulated (admitted) facts and of the findings to which Railway Company excepted. Restatement at length is deemed unnecessary.

Based upon the findings of fact set forth therein, and in accordance with his stated conclusions of law, Judge Olive adjudged the ordinances valid. He ordered that Railway Company construct the required automatic signal devices and place them in operation within four months from the date of judgment; that City reimburse Railway Company "for one-half (½) of the cost of installation of such automatic signal devices at each crossing, up to a maximum of $5,000.00 for each crossing"; and that Railway Company "shall thereafter maintain said signals. . . ."

In appealing to the Court of Appeals, Railway Company assigned errors based on its exceptions (1) to certain of the findings of fact set forth in the paragraphs designated Findings of Fact Nos. 39 through 42, (2) to each and all of the conclusions of law set forth in the judgment, and (3) to the judgment itself. Upon appeal, the judgment was affirmed. 4 N.C. App. 11, 165 S.E. 2d 751.

*Joyner, Moore & Howison; Deal, Hutchins & Minor; and William K. Davis for plaintiff appellant.*

*Hudson, Petree, Stockton, Stockton & Robinson and Thomas E. Capps for defendant appellee.*

*Maupin, Taylor & Ellis for Seaboard Coast Line Railroad Company, amicus curiœ.*

Bobbitt, J.

[1]   The General Assembly, exercising the police power of the State, may legislate for the protection of the public health, safety, morals and general welfare of the people. It has conferred this legislative authority upon the Board of Aldermen of City by the General Statutes codified as G.S. 160-52 and G.S. 160-200(6), (7) and (10) and by Chapter 232, Private Laws of 1927, City's Charter.

City, in its brief, quotes the following portions of Section 54 of City's Charter, *viz.:* "The city of Winston-Salem shall have the control and supervision of all street crossings where railroads and street car tracks intersect or cross its streets, whether such crossings be at grade, over or under its streets. . . . The said city shall have the power to require such railroad company or street railway company, *at its own expense,* to construct, maintain and repair all such crossings at grade, over or under its streets as aforesaid. . . ." (Our italics.)

In *Winston-Salem v. R. R.,* 248 N.C. 637, 105 S.E. 2d 37, City relied upon the quoted portions of Section 54 of City's Charter as authority for the ordinance then under consideration. The ordinance required Railway Company, *at its entire expense,* to rebuild its overpass trestle at entended length so that the width of the space under the trestle available for vehicular traffic would be sufficient to accommodate, in addition to existing traffic on Northwest Boulevard, the traffic on a street *to be opened* (Broad Street Extension) and to cross Northwest Boulevard under the trestle. This Court held the portion of Section 54 of City's Charter purporting to authorize the requirement that Railway Company rebuild the overpass trestle "at

its own expense" was unconstitutional and void, as applied to the facts of that case, in that it constituted "an unreasonable exercise of the police power, amounting to an invasion of the company's property rights in violation of the constitutional guarantee provided by the 'law of the land' or 'due process' section of the Constitution of North Carolina. Article I, Section 17." *Id.* at 655.

The quoted portions of Section 54 *purport* to authorize City to require a railroad company to construct, maintain and repair the crossings "at its own expense." They do not refer to the construction, maintenance or repair of automatic or other signaling devices.

The ordinances now under consideration contain no reference to the quoted portions of Section 54 or any other provision of City's Charter. City, in its answer, asserted that its authority for the ordinances now under consideration derives from the police power conferred upon it by the General Assembly. Judge Olive and the Court of Appeals so held. If otherwise applicable, the quoted portions of Section 54 establish no rule or formula *for apportionment* of the improvement costs as between the municipality and the railroad company.

The stipulated (agreed) facts support Judge Olive's Finding of Fact No. 41 that the grade crossing at 27th Street and the grade crossing at Bethesda Road "constitute hazardous crossings and a danger to persons and property." Plaintiff's exception to this finding of fact is without merit.

[2, 3] The present factual situations are well and accurately distinguished from that involved in *Winston-Salem v. R. R., supra,* by Parker, J., in his opinion for the Court of Appeals. Where trains cross a highway or street at grade, the crossing is hazardous and a danger to persons and property. The danger is lessened, but not eliminated, by the installation and maintenance of automatic signal devices. Without doubt, these benefit Railway Company (1) by reducing the risk of liability for personal injury and property damage claims growing out of collisions at the crossings, and (2) by reducing the risk of damage to its own equipment.

Finding of Fact No. 38 establishes that "(t)he cost of installing a standard railroad crossing flashing light signal is approximately $13,250.00 for each installation, with annual maintenance costs for each installation of approximately $750.00; and, the standard light fixtures to be angled to the west and east at an approximate additional cost of $300." Assuming $13,550.00 would be the cost of construction at each crossing, the ordinances require that Railway Com-

pany pay approximately 63% ($8,536.50 plus) thereof and all (approximately $750.00) of the annual cost of maintenance.

[4] The Board of Aldermen had authority to provide that automatic signal devices be constructed and maintained at each of the crossings here involved. The crucial question is whether the Board of Aldermen had authority to allocate the costs of construction and maintenance in this manner.

[5] Railway Company excepted to Judge Olive's findings that the portion of 27th Street between Farmall Street and Liberty Street and that Bethesda Road (formerly Maplewood Avenue) between Hawthorne Road and Stratford Road are not links in or parts of the State-maintained system of roads; that no State Highway funds have ever been used in the construction or maintenance thereof; and that the State Highway Department has never exerted or attempted to exert any control or supervision over these portions of 27th Street and of Bethesda Road or over either of the grade crossings. The Court of Appeals held, and we agree, that these findings are supported by competent evidence.

[6] Apart from the quoted portions of Section 54 of its Charter, City had authority, in the exercise of its police power to promote public safety and convenience, to allocate to Railway Company some portion of the costs of the installation and maintenance of automatic signal devices at the two crossings. Allocations so made would constitute a denial of Railway Company's *constitutional right* to substantive due process only if the proportion of the costs allocated to it was so unreasonable as to constitute an arbitrary taking of Railway Company's property.

Having reached the conclusion the Board of Aldermen of City had authority to allocate to Railway Company *some* portion of the costs of the installation and maintenance of automatic signal devices at the two crossings, we must next consider and determine the City's authority to determine *what* portion of the costs is to be allocated to Railway Company.

[7] City contends the authority of its Board of Aldermen to make this determination is subject only to the *constitutional* limitation that the allocation must not be so unreasonable as to constitute an arbitrary taking of Railway Company's property. Accepting this contention, Judge Olive held the allocation made by City's Board of Aldermen did not constitute a denial of Railway Company's *constitutional* right to substantive due process. In accord with these bases of decision, the Court of Appeals affirmed Judge Olive's judg-

ment. For the reasons set forth clearly and cogently by Parker, J., in his opinion for the Court of Appeals, we agree. Further elaboration is deemed unnecessary.

Plaintiff contends the General Assembly, by the enactment of G.S. 136-20 and G.S. 62-237, has adopted a State policy with reference to the allocation of costs in connection with crossing improvements. In support thereof, plaintiff cites *City of Memphis v. Southern Ry. Co.*, 67 S.W. 2d 552 (Tenn. 1934).

G.S. 136-20 applies "(w)henever any road or street *forming a link in or a part of the State highway system* . . . shall cross or intersect any railroad at the same level or grade. . . ." (Our italics.) Subsection (b) provides that, when the State Highway Commission orders a railroad company "to install and maintain gates, alarm signals or other approved safety devices," such order "shall specify that the cost of . . . the installation of such safety device shall be allocated between the railroad company and the Commission in the same ratio as the net benefits received by such railroad company from the project bear to the net benefits accruing to the public using the highway, and in no case shall the net benefit to any railroad company or companies be deemed to be more than ten percent (10%) of the total benefits resulting from the project." Subsection (h) provides: "The cost of maintenance of safety devices at all intersections of any railroad company and any street or road *forming a link in or a part of the State Highway System* which have been constructed prior to July 1, 1959 or which shall be constructed thereafter shall be borne fifty per cent (50%) by the railroad company and fifty per cent (50%) by the Highway Commission." (Our italics.)

G.S. 62-237 provides that the North Carolina Utilities Commission "may require the raising or lowering of any tracks or roadway at any grade crossing in a road or street not forming a link in or part of the State Highway System and designate who shall pay for the same by partitioning the cost of said work and the maintenance of such crossing among the railroads and municipalities interested in accordance with the formula provided for grade crossing alterations or eliminations on the State Highway System in G.S. 136-20(b)."

**[8]**　G.S. 136-20 does not apply because the streets here involved, at the location of the crossings, are not links in or parts of the State Highway System. G.S. 62-237 does not apply because here "the raising or lowering of any tracks or roadway at any grade crossing in a road or street not forming a link in or part of the State Highway System" is not involved.

It is noted that the Federal statute now codified as 23 U.S.C. § 130(b), which relates to the allocation of costs where Federal funds are involved, provides: "The Secretary may classify the various types of projects involved in the elimination of hazards of railway-highway crossings, and may set for each such classification a percentage of the costs of construction which shall be deemed to represent the net benefit to the railroad or railroads for the purpose of determining the railroad's share of the cost of construction. The percentage so determined shall in no case exceed 10 per centum. The Secretary shall determine the appropriate classification of each project."

The formula and *statutory* limitation prescribed in G.S. 136-20 and in G.S. 62-237 apply only to the specific factual situations set forth therein. They do not apply to the factual situations here involved. The General Assembly, if it sees fit to do so, may enact legislation providing that a similar formula and limitation shall apply to the allocation by the governing body of a municipality of the costs of installation and maintenance of "gates, alarm signals or other approved safety devices," or of other crossing improvements. Whether this should be done is a policy question to be answered by the Legislature and not by the courts.

[9]    Admittedly, the primary thrust of the decision in City of Memphis v. Southern Ry. Co., supra, is in accord with plaintiff's contention. Suffice to say, that decision is not authoritative in this jurisdiction. Our view is that, although G.S. 136-20 and G.S. 62-237 may indicate a legislative trend in the field of allocating costs of grade crossing improvements, these statutes fall short of establishing a State policy applicable to factual situations other than those to which they relate in express and specific terms.

The decision of the Court of Appeals and opinion of Parker, J., for that court, are in all respects approved and affirmed.

Affirmed.