TIMOTHY H. CRAIG, and the CHATHAM COUNTY AGRIBUSINESS COUNCIL, Plaintiffs v. COUNTY OF CHATHAM, CHATHAM COUNTY HEALTH DEPARTMENT and the CHATHAM COUNTY BOARD OF HEALTH, Defendants

No. COA00-15

(Filed 17 April 2001)

### 1. Counties; Public Health— ordinance—health board rules— swine farms—preempted by state law

The trial court erred by granting summary judgment for defendant county and by denying summary judgment for plaintiffs on the issue of the county's swine ordinance and health board swine farm operation rules, because the ordinance and rules are preempted by state law when the General Assembly has provided a complete and integrated regulatory scheme of swine farm regulations as noted in the legislative purpose sections of N.C.G.S. §§ 106-801 and 143-215.10A.

### 2. Zoning— county ordinance—swine farms—power given by state

The trial court did not err by granting summary judgment in favor of defendant on the issue of the county's zoning ordinance stating that it was applicable only to swine farms served by an animal waste management system having a design capacity of 600,000 pounds steady state live weight or greater, because the ordinance is not preempted by state law when the county enacted the ordinance under the express statement of power given by the state under N.C.G.S. § 153A-340(b)(3).

### 3. Zoning— county ordinance—swine farms—restriction of local action without express declaration

The General Assembly can restrict local action by a county without an express declaration to that effect, because: (1) the General Assembly does not have to retain sole authority or completely delegate to one agency all authority in order to provide a complete and integrated regulatory scheme; and (2) N.C.G.S. § 160A-174(b)(5) provides that the creation of a complete and integrated regulatory scheme bars local action.

### 4. Zoning— county ordinance—swine farms—higher standard of conduct precluded

A county is precluded from enacting an ordinance requiring a higher standard of conduct or condition regarding higher set-

back and buffer distances in relation to swine farms because: (1) the General Assembly has addressed the issue of distance as it relates to swine farms, N.C.G.S. § 160A-174(b); and (2) the state's action precludes the county from any further regulation.

Judge HUDSON concurring.

Appeal by plaintiffs from judgment entered 25 October 1999 by Judge J.B. Allen, Jr. in Chatham County Superior Court. Heard in the Court of Appeals 8 January 2001.

*Ward and Smith, P.A., by Catherine Ricks Piwowarski, Kenneth R. Wooten and Frank H. Sheffield Jr., for plaintiff-appellants.*

*The Brough Law Firm, by G. Nicholas Herman, for defendant-appellees.*

EAGLES, Chief Judge.

This appeal presents the issue of whether Chatham County exceeded its authority to enact certain swine farm regulations.

At the outset, we note that the Chatham County Board of Health and the Chatham County Board of Commissioners are not entities capable of being sued. *See* G.S. § 153A-11 (1999) (granting counties the right to sue and be sued). The present action concerns three sets of Chatham County regulations. The Chatham County Board of Commissioners enacted two ordinances, one entitled "Chatham County Ordinance Regulating Swine Farms" (Swine Ordinance) and another entitled "An Ordinance to Amend the Chatham County Zoning Ordinance to Provide for the Regulation of Swine Farms" (Zoning Ordinance). In addition, the Chatham County Board of Health adopted a set of rules entitled "Chatham County Board of Health Swine Farm Operation Rules" (Health Board Rules).

The Swine Ordinance and the Health Board Rules are identical. The Swine Ordinance and Health Board Rules each set up a system to regulate the operation, construction and expansion of swine farms in Chatham County. The regulations both define swine farms as, "any tract or contiguous tracts of land . . . under common ownership or control which is devoted to raising 250 or more animals of the porcine species." Operators of farms meeting this definition must obtain permits to expand, operate or construct a swine farm. Generally, to obtain a permit the operator must show that he or she has complied with the minimum applicable state and federal require-

ments for animal waste management systems and the other provisions of the swine ordinance.

The regulations do not merely establish a permitting system. They also establish various requirements for setback distances and buffer zones for farms and spray fields. In each category, the county's regulatory requirements are more stringent than those of the State. Additionally, the county regulations contain a financial responsibility provision that requires an operator of a swine farm to guarantee "$2500 per acre feet of [the farm's] waste lagoon capacity." The purpose is to guarantee availability of funds to pay for any necessary clean up costs or to remedy any violations. The operator must guarantee availability of these funds through cash or a cash equivalent placed in escrow or through a promissory note or deed of trust. Finally, the county requires semi-annual tests on wells located on the property of a swine farm.

The Zoning Ordinance makes swine farms a conditional use requiring compliance with the swine ordinance. Unlike the other county enactments, the Zoning Ordinance defines swine farms as:

Any tract or contiguous tracts of land in Chatham County which is devoted to raising animals of the porcine species and which is served by an animal waste management system having a design capacity of 600,000 pounds steady state live weight (SSLW) or greater, regardless of the actual number of swine on the farm.

Plaintiffs, Timothy H. Craig and the Chatham County Agribusiness Council, allege that the State has preempted regulation of this area by "covering the field." Specifically, plaintiffs cite to the Swine Farm Siting Act G.S. § 106-800 (1999), the Animal Waste Management Systems Act G.S. § 143-215.10A (1999) and the regulations of the North Carolina Department of Environment and Natural Resources 15A NCAC 2H .0200 (2000) as demonstrating that the General Assembly has intended to preempt the field. Additionally, plaintiffs allege that the County Board of Commissioners and the Health Board had no authority to enact their respective regulations, that the Health Board went beyond its rule-making authority by considering non-health factors and that the regulations violated the Pollution Control Act, G.S. § 143-215.105 (1999).

The trial court granted defendant's motion for summary judgment and denied the plaintiffs' motion for summary judgment. Plaintiffs appeal.

Summary judgment is appropriate if (1) the pleadings, deposi-
tions, answers to interrogatories, and admissions on file, together
with the affidavits, show that there is no genuine issue as to any mate-
rial fact; and (2) the moving party is entitled to judgment as a matter
of law. G.S. § 1A-1 N.C.R. Civ. P. 56(c) (1999); *see also Moore v.
Coachmen Industries, Inc.*, 129 N.C. App. 389, 393-94, 499 S.E.2d 772,
775 (1998). The parties both argue and we agree that there are no
issues of material fact. Therefore, our only considerations are
whether the trial court erred as a matter of law in granting the defend-
ant's motion for summary judgment and in denying the plaintiffs'
motion for summary judgment.

Plaintiffs contend that the General Assembly has preempted the
field of swine farm regulation. Although plaintiffs acknowledge that
the General Assembly did not include an explicit declaration of pre-
emption in the text of the General Statutes, they argue that the
General Assembly has created a "complete and integrated system of
regulation." This type of regulation would bar any local action regu-
lating swine farms in the absence of an explicit statutory exception.
Defendant counters that the county and Health Board's police power
and the county's zoning power are sufficient to enable them to enact
these regulations. G.S. § 153A-121 (1999); G.S. § 130A-39 (1999) and
G.S. § 153A-340 (1999).

We note at the outset that our Supreme Court has already
determined that the more specific police power limitations of G. S.
§ 160A-174 (1999) also apply to county ordinances. *See State v.
Tenore*, 280 N.C. 238, 185 S.E.2d 644 (1972). G.S. § 160A-174 states
that:

> (b) A city ordinance shall be consistent with the Constitution
> and laws of North Carolina and of the United States. An ordi-
> nance is not consistent with State or federal law when:
>
> . . . .
>
> (5) The ordinance purports to regulate a field for which a State
> or federal statute clearly shows a legislative intent to provide a
> complete and integrated regulatory scheme to the exclusion of
> local regulation.

In our analysis, *Greene v. City of Winston-Salem*, 287 N.C. 66,
213 S.E.2d 231 (1975) is instructive. *Greene* concerned a Winston-
Salem ordinance that required sprinklers in all high rise buildings.
The plaintiff argued that the General Assembly had preempted the

field by creating the State Building Code. *Id.* at 75, 213 S.E.2d at 237. The Supreme Court agreed and held that the General Assembly had created a "complete and integrated regulatory scheme." *Id.* The Court arrived at this conclusion despite the absence of express language from the General Assembly stating a legislative intent to preempt the field. The Supreme Court stated: "We do not think that the Legislature must retain sole authority, or completely delegate to one agency all authority, in order to provide a complete and integrated regulatory scheme which would exclude local regulation." *Id.* According to the Court, a contextual reading of all the relevant statutes compelled the conclusion that the State had preempted the field. *Id.* Specifically, the General Assembly's delegation of enforcement power to the Commissioner of Insurance as well as the sheer breadth and scope of the regulations impressed the Supreme Court that the State had covered the field. *Id.*

Likewise, in *State v. Williams,* 283 N.C. 550, 196 S.E.2d 756 (1973), the Supreme Court invalidated a local ordinance that purported to make it unlawful for a person to possess beer on the public streets of Mount Airy. At that time, the General Statutes provided that individuals eighteen or older could purchase, transport or possess malt beverages for their own use without restriction. *Id.* at 554, 196 S.E.2d at 758. The Supreme Court concluded that the General Assembly had completely regulated the field. *Id.* at 554, 196 S.E.2d at 759. In explaining its decision the Court noted that the General Assembly had stated that it intended to create a uniform system for the control of alcoholic beverages. *Id.* The Court then stated:

> The General Assembly clearly intended to pre-empt the regulation of malt beverages in order to prevent local governments from enacting ordinances such as the one in question. . . . The ordinance in question is not consistent with the general law in that . . . the ordinance purports to regulate a field in which a state statute has provided a complete and integrated regulatory scheme to the exclusion of local regulations.

*Id.*

More recent cases have resulted in similar holdings. In *Onslow County v. Moore,* 129 N.C. App. 376, 499 S.E.2d 780, *disc. review denied,* 349 N.C. 361, 525 S.E.2d 453 (1998), this Court considered a county ordinance that prohibited the operation of an adult business within 1000 feet of another adult business. Ultimately, the Court held that the State had preempted the county's authority to regulate

through the enactment of a statute that prohibited the operation of two adult businesses within the same building. *Moore*, 129 N.C. App. at 386, 499 S.E.2d at 787. Although the General Assembly later amended the statute to allow counties to regulate, the following language is relevant here.

> We conclude that N.C. Gen. Stat. § 14-202.11 does in fact preempt the ordinance's requirement regarding the distance that must be kept between two adult and/or sexually oriented businesses. . . . Thus, **because the General Assembly has already addressed the issue of the distance required between these types of businesses, to the extent that the ordinance attempts to increase that distance to 1000 feet, it is preempted by N.C. Gen. Stat. § 14-202.11.**

*Id.* (emphasis added); *see also In Re Application of Melkonian*, 85 N.C. App. 351, 355 S.E.2d 503, *disc. review denied*, 320 N.C. 631, 360 S.E.2d 91 (1987).

**[1]** In light of these precedents we will now consider the current state swine farm regulations and determine whether the General Assembly has fully addressed and preempted this field. The Swine Farm Siting Act's stated purpose is to assist the development of pork production "by lessening the interference with the use and enjoyment of adjoining property." G.S. § 106-801 (1999). The Act carries out this purpose through a series of setback and notice requirements. Like the Chatham County regulations, this Act applies only to farms that have 250 or more hogs. The setback provisions in G.S. § 106-803 read in pertinent part:

(a) A swine house or a lagoon that is a component of a swine farm shall be located:

(1) At least 1,500 feet from any occupied residence.

(2) At least 2,500 feet from any school; hospital; church; outdoor recreational facility; national park; State Park, . . . historic property . . . .

(3) At least 500 feet from any property boundary.

(4) At least 500 feet from any well supplying water to a public water system as defined in G.S. 130A-313.

(5) At least 500 feet from any other well that supplies water for human consumption. . . .

(a1) The outer perimeter of the land area onto which waste is applied from a lagoon that is a component of a swine farm shall be at least 75 feet from any boundary of property on which an occupied residence is located and from any perennial stream or river other than an irrigation ditch or canal.

The notice provisions impose the following additional requirements.

Any person who intends to construct a swine farm whose animal waste management system is subject to a permit under Part 1 or 1A of Article 21 of Chapter 143 of the General Statutes shall, after completing a site evaluation and before the farm site is modified, notify all adjoining property owners; all property owners who own property located across a public road, street, or highway from the swine farm; the county or counties in which the farm site is located; and the local health department or departments having jurisdiction over the farm site of that person's intent to construct the swine farm. This notice shall be by certified mail sent to the address on record at the property tax office in the county in which the land is located. Notice to a county shall be sent to the county manager or, if there is no county manager, to the chair of the board of county commissioners. Notice to a local health department shall be sent to the local health director. The written notice shall include all of the following:

(1) The name and address of the person intending to construct a swine farm.

(2) The type of swine farm and the design capacity of the animal waste management system.

(3) The name and address of the technical specialist preparing the waste management plan.

(4) The address of the local Soil and Water Conservation District office.

(5) Information informing the adjoining property owners and the property owners who own property located across a public road, street or highway from the swine farm that they may submit written comments to the Division of Water Quality, Department of Environment and Natural Resources.

G.S. § 106-805 (1999).

CRAIG v. CTY. OF CHATHAM

[143 N.C. App. 30 (2001)]

While not limited to swine farms, the Animal Waste Management Systems Act and the regulations enacted pursuant to it apply only to farms with 250 or more swine. G.S. § 143-215.10B (1999). In the act's statement of purpose the General Assembly noted:

> It is critical that the State balance growth with prudent environmental safeguards. **It is the intention of the State to promote a cooperative and coordinated approach to animal waste management among the agencies of the State with a primary emphasis on technical assistance to farmers. To this end, the General Assembly intends to establish a permitting program for animal waste management systems that will protect water quality and promote innovative systems and practices while minimizing the regulatory burden.** Technical assistance, through operations reviews will be provided by the Division of Soil and Water Conservation. Permitting, inspection and enforcement will be vested in the Division of Water Quality.

G.S. § 143-215.10A (1999) (emphasis added). The Act goes on to require a permit for construction or operation of an animal waste management system and directs the Environmental Management Commission to create a permitting system. G.S. § 143-215.10C (1999). In directing the creation of these regulations, the General Assembly mandated that the E.M.C. should:

> [E]ncourage the development of alternative and innovative animal waste management technologies. The Commission shall provide sufficient flexibility in the regulatory process to allow for the timely evaluation of alternative and innovative animal waste management technologies and shall encourage operators of animal waste management systems to participate in the evaluation of these technologies. The Commission shall provide sufficient flexibility in the regulatory process to allow for the prompt implementation of alternative and innovative animal waste management technologies that are demonstrated to provide improved protection to public health and the environment.

G.S. § 143-215.10C(g) (1999). The Commission has created this system for operators to obtain approval for an animal waste management system plan in 15A NCAC 2H. 0200 (2000) *et seq.* Specifically, 15A NCAC 2H .0217 (2000) sets out the procedures for operators to develop an approved animal waste management plan. These regula-

tions mandate (1) required setbacks and vegetative buffers from perennial waters; (2) compliance with the minimum specifications of the U.S. Department of Agriculture's Soil Conservation Service; (3) certification of a technical specialist designated by the Soil and Water Conservation Commission; (4) a required on-site inspection to ensure that animal waste storage and treatment structures meet all standards and specifications; and (5) a required procedure for notifying the Division of Environmental Management of a change in ownership and a statement that the new owner has read, understands and will follow the waste management system plan.

The General Assembly has also directed that an operator include certain things in an animal waste management plan. G.S. § 143-215.10C(e) states:

(e) Animal waste management plans shall include all of the following components:

(1) A checklist of potential odor sources and a choice of site-specific, cost-effective remedial best management practices to minimize those sources.

(2) A checklist of potential insect sources and a choice of site-specific, cost-effective best management practices to minimize insect problems.

(3) Provisions that set forth acceptable methods of disposing of mortalities.

(4) Provisions regarding best management practices for riparian buffers or equivalent controls, particularly along perennial streams.

(5) Provisions regarding the use of emergency spillways and site-specific emergency management plans that set forth operating procedures to follow during emergencies in order to minimize the risk of environmental damage.

(6) Provisions regarding periodic testing of waste products used as nutrient sources as close to the time of application as practical and at least within 60 days of the date of application and periodic testing, at least annually, of soils at crop sites where the waste products are applied. . . .

(7) Provisions regarding waste utilization plans that assure a balance between nitrogen application rates and nitrogen crop

requirements, that assure that lime is applied to maintain pH in the optimum range for crop production, and that include corrective action, including revisions to the waste utilization plan based on data of crop yields and crop analysis, that will be taken if this balance is not achieved as determined by testing conducted pursuant to subdivision (6) of this subsection.

(8) Provisions regarding the completion and maintenance of records on forms developed by the Department, which records shall include information addressed in subdivisions (6) and (7) of this subsection, including the dates and rates that waste products are applied to soils at crop sites, and shall be made available upon request by the Department.

Additionally, the Act sets up two separate inspection requirements. In G.S. § 143-215.10D, the General Assembly requires an annual operations review. As part of this operations review, a technical specialist from the Division of Soil and Water Conservation must review each animal waste management system. The specialist must then report any violations under G.S. § 143-215.10E and any recommended corrective action. Additionally, G.S. § 143-215.10F requires the Division to conduct an annual inspection "to determine whether the system is causing a violation of water quality standards and whether the system is in compliance with its animal waste management plan or any other condition of the permit."

Finally, the General Assembly has expressly limited the county's authority to zone swine farms with one exception. G.S. § 153A-340(b)(1) (1999) prevents a county from zoning a bona fide farm. Bona fide farms include those farms on which livestock is raised. G.S. § 153A-340(b)(2). However, the General Assembly has now given counties the authority to zone swine farms larger than a certain size. The statute reads:

(3) . . . A county may adopt zoning regulations governing swine farms served by animal waste management systems having a design capacity of 600,000 pounds steady state live weight (SSLW) or greater provided that the zoning regulations may not have the effect of excluding swine farms served by an animal waste management system having a design capacity of 600,000 pounds SSLW or greater from the entire zoning jurisdiction.

G.S. § 153A-340(b)(3). Other than as authorized by that limited statutory exception, counties may not act to zone a swine farm.

When read together, these statutes compel the conclusion that the General Assembly has provided a "complete and integrated regulatory scheme" of swine farm regulations. *See Greene*, 287 N.C. at 75, 213 S.E.2d at 237. The General Assembly has provided for a system of permitting, inspection, setbacks, buffers and waste management. Further, the General Assembly has directed that specific state agencies oversee those regulations. An examination of the county's actions here reveals that the county has attempted to regulate in areas where the State has already enacted comprehensive regulations. Under *Greene* and *Onslow County* the county's actions may not stand unless the county enacted its regulations pursuant to the specific exception in G.S. § 153A-340(b)(3).

The legislative purpose sections in G.S. § 106-801 and G.S. § 143-215.10A only reinforce this conclusion. In G.S. § 106-801, the General Assembly's enactment refers to the necessary balance between economic and environmental considerations. In G.S. § 143-215.10A, the General Assembly notes the necessity for providing a cooperative and coordinated approach to animal waste management. Most important for our purposes, the General Assembly stresses the necessity of minimizing the regulatory burden on farmers. To allow the county commissioners and the county board of health to act here would be wholly inconsistent to the General Assembly's stated goals. Specifically, the county could undermine the State's attempts to minimize the regulatory burden and the balance of economic and environmental interests. Additionally, the county's actions would make it more difficult to provide farmers with the regulatory flexibility needed to develop "alternative and innovative technologies." *See* G.S. § 143-215.10C(g) (1999).

[2] Accordingly, we hold that the county Swine Ordinance and the county Health Board Rules are preempted by State law. The county Zoning Ordinance requires a different analysis. The General Assembly has carved out a specific exception to the laws surrounding swine farms. G.S. § 153A-340(b)(3) permits counties to zone swine farms "having a design capacity of 600,000 pounds steady state live weight (SSLW) or greater." However, the statute forbids counties from completely eliminating from the zoning jurisdiction a farm under that section. Here, Chatham County made the Zoning Ordinance applicable only to swine farms "served by an animal waste management system having a design capacity of 600,000 pounds steady state live weight (SSLW) or greater." Accordingly, the county enacted the zoning ordinance pursuant to the express statement of power given by the State and it is not preempted.

**[3]** The county argues that the General Assembly may not restrict local action without an express declaration to that effect. We disagree. The Supreme Court in *Greene* made it clear that the General Assembly does not have to retain sole authority or "completely delegate to one agency all authority, in order to provide a complete and integrated regulatory scheme." *Greene*, 287 N.C. at 75, 213 S.E.2d at 237. Rather, the creation of a complete and integrated regulatory scheme bars local action. G.S. § 160A-174(b)(5). We do not believe that *In re Application of Melkonian*, 85 N.C. App. 351, 355 S.E.2d 503 (1987) or *Southern Railway Co. v. City of Winston-Salem*, 4 N.C. App. 11, 165 S.E.2d 751, *aff'd*, 275 N.C. 465, 168 S.E.2d 396 (1969) require an opposite conclusion. *In re Melkonian* involved the plaintiff's attempt to obtain a special use permit to operate a tavern after the ABC Commission had granted plaintiff a license to sell alcoholic beverages. The Court held that the State had preempted the city's permitting system by expressly prohibiting local regulation of alcoholic beverages. *Melokonian*, 85 N.C. App. at 360, 355 S.E.2d at 509. While an express legislative statement is clearly adequate to bar local action, the implementation of a complete and integrated system is also sufficient. We do not read *Melkonian* to hold that an express legislative statement is necessary.

In *Southern Railway*, the Court held that local action was not preempted by a statute that "clearly negative[d] any intention that the statute should be construed as the adoption of a statewide policy." *Southern Railway*, 4 N.C. App. at 20, 165 S.E.2d at 757. The statute in question expressly limited its application to certain streets and roads. *Id.* Here, the defendant points to no language in the regulatory structure that negatives the intent to provide a complete and integrated system or limits its application. Therefore, the county's argument fails.

**[4]** Finally, the county argues that they are not precluded from setting the regulations' higher setback and buffer distances because "the fact that a State or federal law, standing alone makes a given act, omission, or condition unlawful shall not preclude city ordinances requiring a higher standard of conduct or condition." G.S. § 160A-174(b) (1999). In this context, we disagree. As we held in *Onslow County*, the State's and county's regulations deal with issues of distance and not conduct. Further, the General Assembly has addressed the issue of distance as it relates to swine farms. Therefore, the State's action precludes the county from any further regulation.

CRAIG v. CTY. OF CHATHAM

[143 N.C. App. 30 (2001)]

Accordingly, we hold that the trial court erred in granting summary judgment for the defendant and in denying summary judgment for the plaintiffs on the issues of the Swine Ordinance and Health Board Rules. However, the trial court was correct in granting summary judgment to the defendant as to the Zoning Ordinance. We now remand this case for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part and remanded.

Judge SMITH concurs.

Judge HUDSON concurs with a separate opinion.

HUDSON, Judge concurring.

I concur with the result reached by the majority. I write separately because, although I agree that the Swine Ordinance regulations and the Health Board Rules may be identical in substance, I believe the reason the Health Board Rules may not stand is distinct from the reason the Swine Ordinance may not stand.

I agree with the majority that the General Assembly has preempted the field of swine farm regulations. I also agree with the proposition that the regulations in question therefore may not stand unless they are found to have been enacted pursuant to some specific statutory exception, such as N.C.G.S. § 153A-340(b)(3) (1999). However, in addition to G.S. § 153A-340(b)(3), I believe the General Assembly has carved out a specific exception to the state swine farm laws in enacting N.C.G.S. § 130A-39 (1999) ("Powers and duties of a local board of health"). Section (b) of this statute permits a local board of health to "adopt a more stringent rule in an area regulated by the Commission for Health Services or the Environmental Management Commission where, in the opinion of the local board of health, a more stringent rule is required to protect the public health." G.S. § 130A-39(b). I believe this statute provides an express grant of authority to a local board of health to enact more stringent regulations, even where the General Assembly has preempted the area of regulation. I further believe that the Health Board Rules in question fall within this exception because they provide for more stringent regulations than the state swine farm laws enacted by the General Assembly. Thus, I do not believe the Health Board Rules are preempted by State Law.

However, I believe the Health Board Rules may not stand for a different reason. In enacting the Health Board Rules, I believe the Board of Health exceeded its authority and infringed on the legislative power of the General Assembly by taking into consideration not only health related issues but economic issues as well. Determining the proper balance between health concerns and economic concerns is a role reserved for the legislature and, therefore, a local board of health exceeds its authority when it enacts rules based on a balancing of factors other than health. *See City of Roanoke Rapids v. Peedin*, 124 N.C. App. 578, 478 S.E.2d 528 (1996). For this reason, rather than the doctrine of preemption relied upon by the majority, I would deny summary judgment for defendants and grant summary judgment for plaintiffs on the issue of the Health Board Rules.